T. A. Tooey, Appellant, v. C. L. Percival Company, Appellee.

MASTER AND SERVANT: "Net Profits" as Compensation. The term "net profits," within the meaning of a contract of employment which calls for a percentage of the "net profits" during the term of the employment, embraces only profits which have been reduced *to actual possession in the form of cash or its equivalent by completed sales.* The following items, therefore, are not "net profits:"

1. The difference between the selling price and the net cost price on orders taken *before,* but shipped *after,* the termination of employment.

2. The difference between the net cost price and the market value of goods on hand on the date employment terminated. .

3. The difference between the net cost price of goods purchased *before,* but delivered *after,* the termination of employment, and the market value of such goods on the date employment terminated.

4. Sums paid out during the term of employment for shelving and flooring, to protect the goods.

CONTRACTS: Mutual Construction by Parties. The mutual construction placed by parties on a contract of doubtful meaning is controlling with the courts. So held as to the meaning of the term "net profits" in a contract of employment.

*Appeal from Polk District Court.*—Joseph E. Meyer, Judge.

APRIL 5, 1921:

REHEARING DENIED OCTOBER 1, 1921.

ACTION in equity for accounting against the defendant corporation and for judgment in such amount as may be found due plaintiff under the terms of a written contract, as compensation for services rendered by him as manager of defendant's paper and woodenware department. Upon the referee's report, the court found for the defendant, with the exception that plaintiff was given judgment for $127.76, with interest, which represented

salary for the month of January, 1917, less an admitted deduction in the sum of $22.24.  Plaintiff appeals.—*Affirmed.*

*Miller, Kelly, Shuttleworth & Seeburger,* for appellant.

*Miller, Parker, Riley & Stewart,* for appellee.

DE GRAFF, J.—This appeal concerns itself with the construction of a written contract of employment between plaintiff and defendant, and involves primarily the legal definition of the term "net profits," as used in said contract.  Plaintiff was engaged as manager of the paper and woodenware department of defendant company, and was to receive a salary of $150 per month "and 25 per cent of the net profits of this department up to December 31, 1916.  Eight per cent on the amount of capital invested in this department to be deducted before profit division is made.  The division of the profits to be made in January, 1916, and January, 1917."  The contract became effective July 29, 1915.  The stipulated salary was paid, and also the net profits on sales made and delivered to defendant's customers "up to December 31, 1916," when the contract was terminated.

1. MASTER AND SERVANT: "net profits" as compensation.

Plaintiff's claim is based on the "net profits" on the following items:

"1st.  Net profits of $1,403.18, being the difference between the selling price and the cost price and carrying charges on shipments of merchandise from said department after December 31, 1916, on bona-fide orders therefor received and approved by defendant prior to said date.

"2d.  The net profits of $8,788.69, being the difference between the total cost price and carrying charges of merchandise purchased for said department during the year 1916, but not delivered to defendant until after December 31, 1916, and the market value of the same merchandise on December 31, 1916.

"3d.  Net profits of $18,781.16, being the difference between the cost price and the market value of merchandise on hand in said department on December 31, 1916.

"4th.  Net profits of $492, being for shelving and flooring

in said department, which plaintiff claims to be substantial fixtures, and therefore assets, but which amount was by defendant erroneously charged to said department as an expense item.

"5th.   In addition, plaintiff claims $150 less an admitted deduction of $22.24 or a net amount of $127.76 for services actually rendered defendant by him in said department during a part of January, 1917."

I.   We will first apply the principles of bookkeeping to the facts in this case.   These principles are not strictly a legal test, but constitute a valuable aid in reaching a correct conclusion on the propositions submitted by appellant.

Let us suppose a practical bookkeeper prepared a balance sheet of the defendant's business at the close of the year 1916. It would present a general form and appearance as follows:

## Balance Sheet, December 31, 1916.

| | Dr. Trial Balance Cr. | | Losses | Gains | Resources | Liabilities |
|---|---|---|---|---|---|---|
| Capital Stock | | $ 40,000. | | | | $ 40,000. |
| Merchandise | $ 294,567.21 | 286,981.47 | | $39,467.09 | $ 97,052.83 | |
| Expense | 35,000. | | $35,000. | | | |
| Cash | 56,280. | 49,794.67 | | | 6,485.33 | |
| Freight | 1,000. | | 1,000. | | | |
| Insurance | 250. | | 250. | | | |
| Traveling Expenses | 1,508.93 | | 1,508.93 | | | |
| Int. and Disc. | 600. | 600. | | | | |
| Bills Rec. | 50,000. | 30,000. | | | 20,000. | |
| Bills Pay. | 5,000. | 8,000. | | | | 3,000. |
| Per. Accts. Rec. | 90,000. | 60,000. | | | 30,000. | |
| Per. Accts. Pay. | | 58,830. | | | | 58,830. |
| | $ 534,206.14 | $ 534,206.14 | | | | |
| Net Profit | | | $31,708.16 | | | |
| | | | $39,467.09 | $39,467.09 | | |
| | | | | | | 51,708.16 |
| | | | | | $ 153,538.16 | $ 153,538.16 |

On the assumption of the correctness of the items and the figures used in the foregoing balance sheet, plaintiff's percentage of net profits is $12,927.04 for the year ending December 31,

1916, which amount he actually received from the defendant company, exclusive of salary.

Let us interpret this balance sheet in the light of plaintiff's claims. It is shown by the testimony that orders for merchandise were filed with the department prior to December 31, 1916, but the merchandise had not been shipped on said date, and furthermore such orders were subject to cancellation. What would the bookkeeper do with an order for merchandise, and what would his books show on December 31, 1916, as to such orders? Under the testimony, he did not enter such orders upon the books as a sale of merchandise until shipment was actually made. Therefore, the balance sheet would not include such sales, and the net profit would neither be increased nor diminished by having such orders on file. The merchandise account would be credited only when the goods were shipped.

Again, it is urged that, at the close of the year 1916, the plaintiff was entitled to 25 per cent of the difference between the cost price of the merchandise then on hand and the market value of such merchandise at that time. This proposition assumes an actual sale of all merchandise in stock.

Would the annual balance sheet show a profit or loss as to merchandise then on hand? Positively, no, unless an item of depreciation was entered.

The debit merchandise ledger account would show the value of the merchandise at cost price purchased and received during the year, plus the inventory balance of the preceding year. The credit side would show merchandise sales. In the column of the balance sheet marked "Resources," opposite "Merchandise," appears the inventory cost value of stock on hand January 1, 1917. The net loss or gain in the merchandise account would be easily determined from these figures.

We are not dealing with a concern in process of liquidation, but with a going concern.

It is also claimed by plaintiff that the merchandise purchased during the year by the company, but not delivered until after the expiration of his contract, should be taken into consideration, and 25 per cent of the difference between the total cost price and carrying charges and the market value of the same should be paid to the plaintiff under the terms of his con-

tract. This item would not appear on the balance sheet at the end of the year, nor would it be taken into account by the book-keeper in determining the net profits of the business. Not until this merchandise was received by the company would merchandise be debited, and cash, personal accounts payable, or bills payable would then be credited.

To hold otherwise in these particulars, as a matter of practical bookkeeping, the plaintiff would be securing a percentage of the net profits which we might expect to appear on the balance sheet of the company for the year ending 1917. This surely was not within the contemplation of the parties or within the terms of the contract.

The item of expense for shelving and flooring in the paper department of the defendant company is properly chargeable to "Expense." It would appear finally in the balance sheet in the loss column. This expense was incurred in order to protect the paper from damage by water, and is, therefore, an item of maintenance or repair, and chargeable as an expense, the same as rent or insurance. See *Stein v. Strathmore Worsted Mills*, 221 Mass. 86 (108 N. E. 1029).

II. Let us next apply the test of legal definition. What are net profits, in a legal sense?

Plaintiff states that "the phrase net profits and the terms of the contract" are clear and unambiguous. If this were true, this case would not be before us. It is written in *In re Myers' Estate*, 238 Pa. 195 (86 Atl. 89):

"It can scarcely be said that the meaning of an instrument is plain, about which counsel, courts, and interested parties disagree."

The meaning of the term "net profits," as used by the parties to the written contract, was never discussed or defined by them. We are confined, therefore, to such interpretation and definition as the acts and the conduct of the parties warrant, and as are furnished by the decisions of courts of last resort. The principles of the science of bookkeeping restrict the net profits of any business to such profits as have been reduced to actual possession, in the form of cash or its equivalent, by completed sales. In other words, the difference between the cost price and the market price of unsold goods does not constitute a profit in a

going concern, except in a speculative sense. It might properly be denominated a "paper profit."

In *Jennery v. Olmstead*, 36 Hun (N. Y.) 536, Peckham, J., speaking for the court, says:

"It does not appear that defendant's counsel treats the method pursued by defendants as showing actual, realized profits, but he terms them *estimated* profits, and argues that the contract meant *estimated* profits, instead of actual, realized profits; for otherwise he claims that every piece of property of the bank would have to be sold annually, in order to determine whether profits were made, which, he very sensibly states, would be absurd. The trouble with this mode of reasoning lies in the confusion of property with profits. * * * The profits are, as I have said, the amount of money received by the bank from its investments, by way of interest, over and above the amount of interest it has to pay its depositors, together with the amount of any money it had received by the sale of property, over and above its cost to the bank. If such a sale had been made, then a profit had arisen; but if not, then no profit had accrued simply from the fact that the property, if sold, would have resulted in a profit.".

The foregoing case involved the construction of a contract with the president of the bank, which provided that, as president, he should receive a sum or sums from the net profits of the institution not to exceed $1,000 per annum, after paying all incidental expenses of the bank.

In *Hutchinson v. Curtiss*, 45 Misc. Rep. 484 (92 N. Y. Supp. 70), the court had occasion to determine the meaning of "net profit," and it is said:

"When the sales actually took place, they were entered in the books. But to calculate months in advance on the result of the future transactions, and on such calculations to declare dividends, was to base such dividends on paper profits,—hoped-for profits, future profits,—and not upon the surplus or net profits required by law."

In *Briggs v. Groves*, 9 N. Y. Supp. 765, the contract provided that plaintiff should receive "the one-fourth part of the net profits which shall accrue to said clothing business during the

time he shall so remain in said employment,'' and in constru-
ing this language, the opinion states:

''The profits were properly estimated on the finished sales
while he was in the defendant's employ.''

Profits are not composed of earnings never received or en-
tered upon the books of the corporation. Without receipts or
the equivalent in a business, profits do not legally exist. Money
earned as interest and not received cannot be distributed as
dividends to stockholders.

''The word 'profits' signifies an excess of the value of re-
turns over the value of advances, the excess of receipts over
expenditures,—that is, net earnings (*Connolly v. Davidson*, 15
Minn. 519); the receipts of a business, deducting current ex-
penses. It is equivalent to net receipts. (*Eyster v. Centennial
Board of Finance*, 94 U. S. 500.) In commerce, it means the ad-
vance in the price of the goods *sold* beyond the cost of purchase.''
*People v. San Francisco Sav. Union*, 72 Cal. 199.

The word ''income'' means what has come in. It must have
been received. ''Net profits'' mean the difference between the
''income'' and the ''outgo,'' and this must be computed on con-
summated sales, and not on mere orders, subject to cancellation,
or from which nothing may ever be received.

The principle stated in *Simcoke v. Sayre*, 148 Iowa 132,
is not controlling, and the language used in *Fries v. Parr*, 139
N. Y. Supp. 220, so far as the opinion deals with ''net profits,''
is dictum. The case of *In re Spanish Prospecting Co.*, L. R. 1911,
1 Ch. Div. 92, states a principle applicable to a business in pro-
cess of liquidation.

Plaintiff's contract terminated at a definite time, and the
balance sheet of the company at that time must determine his
percentage of the net profits earned during that year. How-
ever, in the case last cited, it is said:

''The word 'profits' has, in my opinion, a well defined
legal meaning, and this meaning coincides with the fundamental
conception of profits in general parlance; although in mercan-
tile phraseology the word may, at times, bear meanings indi-
cated by the special context which deviate in some respects from
this fundamental signification. * * * In the absence of special

stipulations to the contrary, 'profits,' in cases where the rights of third parties come in, mean actual profits.''

III. It is a well established rule of law that, in all cases in which the terms of the contract or the language employed raise a question of doubtful construction, and it appears that the

2. CONTRACTS: mutual construction by parties.

parties themselves have practically interpreted their contract, the courts will follow that practical construction. *Chamberlain v. Brown,* 141 Iowa 540; *Pratt v. Prouty,* 104 Iowa 419; *Stewart v. Pierce,* 116 Iowa 733; *Daily v. Minnick,* 117 Iowa 563; *Jordan Co. v. Caylor,* 36 Ind. App. 640 (76 N. E. 419); *Daintrey v. Evans,* 148 App. Div. 275 (132 N. Y. Supp. 126); *Mitau v. Roddan,* 149 Cal. 1.

The practical construction which the parties place upon the terms of their own contract must prevail over the literal meaning of the contract according to which a party seeks to obtain a reduction in the contract price. *District of Columbia v. Gallaher,* 124 U. S. 505. The practical interpretation by the parties to a contract is the best indication of the true intent. *Animas Consol. Ditch Co. v. Smallwood,* 22 Colo. App. 476 (125 Pac. 594). When the parties by their acts and conduct concur in the construction and interpretation of a contract, courts will regard and give effect to their exposition, if, in so doing, public law or policy is not infringed. *Knotts v. Bartlett,* 83 W. Va. 525 (98 S. E. 590).

Did the parties to the contract in question disclose what they had in mind, and did they interpret the meaning of the term "net profits" by their own acts and conduct? It was the practice of the Percival Company to price all of its annual inventory at cost. This was also true of the Pratt Paper Company, for which plaintiff was general manager for two years preceding his employment by the defendant company. Both companies followed the same method of determining the net profits at the end of each fiscal year.

In August, 1915, the inventory of the defendant company was priced at cost. In December, 1916, it prepared an annual statement of the net profits. The testimony shows that the statements or balance sheet made in August, 1915, and also in December, 1916, did not include therein orders taken in 1915 for delivery to customers in 1916, nor goods purchased from the mills in 1915 for delivery to defendant company in 1916.

Plaintiff was in absolute charge of the matter of making the annual inventory. He was manager of the paper department, with full power to buy and sell, and with the right to express his own judgment in the matter of the conduct of the business in his department. He acted freely, and was untrammeled by any influence on the part of the officers of the defendant company.

In the light of this record, we can find no justification for allowing either the inventory or the balance sheet to take a different form upon the termination of the plaintiff's contract. They must remain true to the form possessed during the period of his employment when other inventories and balance sheets were prepared, and for a like purpose: to wit, to determine the net profits of the business, in order to fix the compensation to which plaintiff was entitled under his contract.

Whether we consider this case from the viewpoint of practical bookkeeping, or from a study of the legal definition of net profits, or from the practical construction which the parties themselves put upon the terms of the contract, we reach the same conclusion. Wherefore, the judgment and decree entered by the trial court are—*Affirmed.*

EVANS, C. J., WEAVER and PRESTON, JJ., concur.