WINFIELD STATE BANK, Appellee, v. A. H. SNELL et al., Appellants.

No. 39679.

SEPTEMBER 24, 1929.

*Livingston & Eicher,* for appellants.

*Galer & Galer* and *C. J. Lynch,* for appellee.

MORLING, J.—The pleadings and evidence are elaborate. In our view, but one question need be discussed, and that is the legal effect of the agreement of March 21, 1925, Exhibit 6 of this record. Intervener concedes that it occupies no better position than does the defendant.

In 1920, Snell owed plaintiff $4,000. Snell assigned to plaintiff, as collateral security, his stock in the Inter Ocean Reinsurance Company. Snell was also indebted to the Farmers National Bank for $6,000. Snell owned three tracts of land: one of 141 acres, on which intervener held a first mortgage of $20,000; another of 80 acres, on which there was a first mortgage of $10,000; and the third of 102 acres, on which there was a first mortgage of $16,000, held by the Farmers National Bank. Snell, on October 29, 1921, executed to Glass, as trustee, to whom Davidson

succeeded, a trust deed for the three tracts, to secure the $6,000 owed by him to the Farmers National Bank, to secure also $2,600 which had been guaranteed by Snell to that bank, and to secure the $4,000 owed to plaintiff. Snell says this trust deed was made at the suggestion of the cashier of the Farmers National Bank. Plaintiff's cashier testifies, on appellants' cross-examination, without contradiction, that:

"Snell got in pretty bad with that Missouri proposition, and I was called up one evening by Mr. Karsten [the cashier of the Farmers National] * * * Mr. Karsten says, 'Mr. Snell would like to cover up from Missouri, and would like to put your name in a trust deed.' 'Well,' I says, 'if it is an accommodation to him, put it in.' That is why I got hooked up with the trust deed."

On March 17, 1925, Snell, as he says, went to his attorney's office "about giving a chattel mortgage on my personal property to the Farmers National Bank at Winfield. I authorized him to draw a contract. Exhibit 6 is the contract." He says that he did not authorize his attorney to make any changes in it. Snell says that nobody from the Winfield State Bank (plaintiff) was there, and that he had had no previous talk with anybody connected with plaintiff. The attorney testifies that both banks were wanting to get a chattel mortgage, but that his talk was with the cashier of the Farmers National Bank. He also testifies that the Inter Ocean Reinsurance Company stock was not mentioned in any way. The attorney says that he discussed with the cashier of the Farmers National Bank "particularly, together with the indebtedness, the question as to whether Mr. Snell might be relieved from any deficiency judgment or personal liability upon the indebtedness secured by the trust deed, in the event of the foreclosure of it. I did not know at that time that the Farmers National Bank had no other security of this particular loan. * * *"

The cashier of the Farmers National Bank testifies, without objection, that:

"The substance of what was said was that we would ask no deficiency judgment on Mr. Snell in case he was not successful with his farming operations after a period of one year * * * I

understood that it would be necessary that the Winfield State Bank be a party to the instrument, Exhibit 6, on account of the trustee.''

He or his bank had no, authority to represent plaintiff. Snell's attorney drew the agreement, and delivered it to the cashier of the Farmers National Bank. The agreement purports to be between the two banks (plaintiff and the Farmers National Bank) and the trustee, Davidson, on the one part, and Snell and his wife on the other part. It recited that, in consideration of Snell and wife's making a chattel mortgage on the crops for $2,500, to be advanced by the Farmers National Bank "to pay interest on mortgage against said lands and for taxes assessed against said lands which mortgage and note has been delivered to and accepted by said Farmers National Bank, do hereby agree that in event it becomes necessary for said banks or either of them or said trustee to exercise their rights under a certain trust agreement and trust deed heretofore made by and between the parties hereto, that the said first parties will not ask for a deficiency or personal judgment against the said A. H. Snell and Katie Snell, or either of them, for any sum growing out of the indebtedness owing by A. H. Snell and Katie Snell, or either of them, to said first parties or either of them, which indebtedness now exists or may be created by the execution of the $2,500.00 note delivered, as above mentioned, but will rely wholly upon their rights under said trust agreement and trust deed and chattel mortgage, for the security and payment of all indebtedness now existing between the said parties.''

Appellants' contention is that the last clause operates to release the pledge of the stock. Our view of its interpretation and effect, in harmony with that of the lower court, renders it unnecessary to consider the evidence offered to prove an alleged express oral agreement between Snell's attorney and the Farmers National Bank, communicated to plaintiff before plaintiff signed it, that the written agreement should not affect the plaintiff's right to the stock.

The agreement was presented by the Farmers National Bank to plaintiff. Plaintiff signed it, and through the Farmers National Bank, returned it to Snell. Appellants' evidence shows that the stock was at no time mentioned,—was not the subject

of the agreement. The subject of the discussion was a proposed advance by the Farmers National Bank of $2,500 on chattel mortgage, to pay prior liens of taxes and interest on first mortgages. It was the Farmers National Bank, and not plaintiff, that was to make this advance. The Farmers National Bank held one of the first mortgages. Snell was manifestly in financial straits. There were upon his land heavy mortgages, superior to the lien of the trust deed. Snell was otherwise greatly indebted to the Farmers National Bank, as well as to plaintiff. Plaintiff's lien on the land was subject to large first mortgages, and was coordinate with the lien to the Farmers National Bank for Snell's general indebtedness to it. Plaintiff was getting no other security, and did not intend to release the pledge of the stock. Such a release was (on appellants' theory) never the subject of negotiation. The subject of the agreement was the advance by the Farmers National Bank on chattel mortgage, to pay interest and taxes, and the possible exercise of the right to foreclose the trust agreement and recover a deficiency or personal judgment. It was solely because of the latter that plaintiff was brought into the arrangement. Notwithstanding appellants' contention (contradicted by plaintiff) that plaintiff had security in its trust deed which it was anxious to preserve, conditions were manifestly such that it would have been folly for plaintiff gratuitously to release its security on the stock. The agreement on its face is not ambiguous. Its meaning is that, in the event of foreclosure, no personal judgment for the mortgage indebtedness or the $2,500 would be claimed against Snell. The alleged uncertainty arises out of the collateral fact that plaintiff held other security,—that on the stock. The stock was in the possession of plaintiff. If Snell, or his attorney, had any thought of demanding a release of the pledge of the stock, they naturally, if in good faith, would, in the circumstances shown here, have said so, and would have made provision accordingly in the agreement. The agreement was drawn by them, not by plaintiff. It is not claimed that any demand for a surrender of the stock to Snell was made, then or afterward. In the summer or fall of 1925, following the making of the agreement Exhibit 6, Canby, a co-stockholder in the Inter Ocean Reinsurance Company, presented to Snell the then proposed arrangement for a voting trust. Canby testifies that

Snell said that his stock certificate was held by plaintiff "as collateral," that:

"I told him that, so far as the financial side was concerned, that this did not hinder anything; that the dividends and everything were just exactly the same; and that it did not alter any obligations of any kind, and our going into this was mainly to protect the company from the ravages of outside agencies."

Snell testifies that he told Canby:

"My stock has been collateral up at the Winfield State Bank, and was still with the bank. I told him it had been collateral there, and that it was still at the bank."

Snell then signed the assignment of his stock certificate to the trustees. He also signed an instrument reciting that the stock had been pledged to the Inter Ocean Reinsurance Company, and that he desired to have it transferred to the trustees under trust agreement dated July 22, 1925, and directed the Inter Ocean Reinsurance Company to transfer his stock "now held by said company as a pledged and as collateral security * * * and I hereby assign and transfer to the Inter Ocean Reinsurance Company the said trust certificates to be held as security for the said indebtedness by me owing to said company and as security for an indebtedness by me at any time hereafter owing said company and do execute herewith an instrument assigning to said company said trust certificate to be issued as above directed and the lien of said company as to said stock shall continue and in no event be waived or released, the said trust certificate to be held in lieu of the stock certificate now held."

Snell was not owing the Inter Ocean Reinsurance Company. The form used was evidently a standard form, which was being used by Canby in cases where the stock was under pledge, and was signed because the stock was in pledge. Sometime afterward, the name "the Inter Ocean Reinsurance Company," in this assignment, as assignee, was changed to "Winfield State Bank;" and corresponding changes were made where the Reinsurance Company was referred to as "assignee." When or by whom these changes were made, does not appear. Snell says it was understood that the trustees would arrange with the bank for the forwarding of the certificate for the purpose of having the stock

included in the voting trust. In December following, the plaintiff having received a dividend check on this stock, Snell indorsed it, got credit for it on his indebtedness to plaintiff, and executed a new note for the balance. Snell testifies that he went to the plaintiff, in response to notice that he had a past-due note there; that the dividend check was indorsed; that he executed a new note for the balance, and received the old note, canceled; that he asked the cashier "about taking the amount out of the lien or security, and taking over the insurance company stock that they held, and releasing the land."

"Q. And you suggested to him that the dividends which were being received on the Inter Ocean Reinsurance Stock which they held under a lien were not equal to the interest that was accumulating, did you? A. Yes, sir. Q. And you suggested to him that it would help some if they would make an outright purchase of the stock which they held as collateral, and release the land, did you? A. Release the note, was just the same as the land."

The testimony preponderates that subsequently, on the occasion of the settlement of a foreclosure action in May, 1926, Snell's attorney, in Snell's presence, said that the agreement then made would not in any way affect the stock.

The evidence is that, on November 5, 1925, the stock certificate for the Snell stock was sent to the Merchants National Bank, in a letter on the letterhead of the Inter Ocean Reinsurance Company, with the request that a trust certificate be sent to the plaintiff. The Merchants National Bank made out therefor Trust Certificate No. 185, and, by error, sent Trust Certificate No. 185 to Snell. On May 12, 1926, the Merchants National Bank demanded of Snell a return of Certificate No. 185. On August 6, 1926, the Merchants National Bank notified Snell that it had canceled the certificate, and was issuing a duplicate to plaintiff. It did issue to plaintiff, accordingly, the certificate which is the subject of this suit. Intervener foreclosed its first mortgage on Snell's land, and on May 25, 1926, recovered judgment, which resulted in a deficiency of $1,500. On November 1, 1926, according to intervener's allegation, Snell made to intervener the assignment of Certificate No. 185, and on November 12, 1926,

intervener's attorney advised the Merchants National Bank of such assignment. Snell's attorney testifies:

"It was through me that Mr. Snell negotiated with the Washington Loan & Trust Company at the time the assignment was arranged. The dealings they had resulted in the Washington Loan & Trust Company obtaining whatever claim they may have obtained or asserted themselves to hold, was had through me, as Mr. Snell's representative, so far as I know."

The assignment to intervener was evidently to secure this deficiency judgment.

It must be remembered that it is the appellants who are claiming the release. It is for them to show that the pledge to plaintiff was released. That there was no talk about or agreement for a release, and that plaintiff never intended to release, is indisputable. The release was drawn by Snell's own attorney. The ambiguity, if any, arises upon facts extraneous to the release, and may be removed by proof of extraneous facts. The purpose of the parties in the execution of the instrument is clear. The instrument should be interpreted in the light of the situation of the parties, the circumstances surrounding its execution, and the purpose sought to be accomplished, and, if possible, so as to carry such purpose into execution. Construction should be most strongly against the user of the words, should be in accordance with the object sought to be accomplished, and should be reasonable and fair, and not absurd. Construction should be in conformity with good faith and fair dealing, rather than with bad faith or fraud on the part of Snell. The practical interpretation placed upon the agreement that it did not affect plaintiff's right to the stock should, under the facts here, be given effect. 13 Corpus Juris 540, 541, 544, 546.

In our view of the case, the bad faith that must be attributed to Snell was in yielding to the temptation to take advantage of the mistake of the Merchants National Bank, rather than a preconceived intention of deceiving plaintiff in the preparation of an agreement which, from appellants' present contention, would

be subject to an interpretation that plaintiff reasonably believed to be not intended.—*Affirmed.*

ALBERT, C. J., and STEVENS, DE GRAFF, and WAGNER, JJ., concur.