FORT DODGE CO-OPERATIVE DAIRY MARKETING ASSOCIATION, Appellee, v. W. L. AINSWORTH, Appellant.

No. 42091.

NOVEMBER 21, 1933.

REHEARING DENIED APRIL 5, 1934.

Price & Burnquist, for appellant.

Mitchell & Mitchell and D. M. Kelleher, for appellee.

EVANS, J.—The members of the plaintiff association were producers of milk. The plaintiff association was formed for the purpose of marketing such milk. Its headquarters were located at Fort Dodge, and its business was transacted therein. The plaintiff performed its functions by selling the milk and causing it to be delivered by the producers, to four certain distributors located in the same city. At the time of the events involved in this controversy, the plaintiff had a membership slightly less than two hundred. Each member contracted with the plaintiff to deliver the milk produced by him exclusively to the plaintiff. The contract provided that it should be deemed to be extended from year to year. The contract gave to the member the right to withdraw at the end of any calendar year by giving notice between November 15, and November 30, preceding. This latter provision was later changed by purported action of the board of directors, which fixed the month of May as the time for the preceding notice. Whether this action of the board of directors created a valid change in the by-laws, we shall have no occasion to determine. One of the distributors to whom the plaintiff society sold its milk was the Sanitary Dairy Company. This company was owned and operated by Gesslin. This concern was in some degree of financial distress. Its property was incumbered by a mortgage for $2,500 held by the plaintiff and maturing on the first of July, 1932. The plaintiff had declined to consider an extension of time. In order to meet the emergency, Ainsworth and one Scheerer

came to the aid of Gesslin and loaned the necessary funds to pay off the plaintiff's mortgage. Pursuant to the same contract they became customers of the Sanitary Dairy and sold their milk production thereto. The defendant Ainsworth notified the secretary of the plaintiff society that he was quitting the society and transferring his patronage. Pursuant to this notice he refused any further patronage to the plaintiff. This was the breach of contract sued for. The suit is predicated upon section 6, of the contract, which is as follows:

"That in case of failure of party of the second part to deliver his milk to party of the first part, as provided herein, he shall pay as liquidated damages, and in consideration of the difficulty of ascertainment of the precise damages suffered by party of the first part, and by *members* thereof who shall have entered into *contracts* similar to these presents, the specific sum of twenty-five dollars ($25.00) *for each and every such failure and breach of this contract,* and in addition thereto a sum equivalent to the amount of the deductions which would have been made payable had party of the second part delivered his milk as herein provided. All deductions and damages shall be payable at the office of party of the first part at Fort Dodge, Iowa."

The foregoing section 6 is contained in the articles of incorporation as a part thereof and as such is incorporated in all the contracts with the members. It speaks in the plural number in the same form as though it were a joint contract made between the plaintiff society and all its members.

Some of the questions which confront the plaintiff, as to the interpretation of this contract, may be stated:

(1) Was the renunciation announced by the defendant on June 15, 1932, and put into actual effect by him, from and after June 15, one breach of the contract, or did it become *many* breaches by its persistence?

(2) Did the contract fix the sum of $25 as liquidated damages collectible from each member, who breached the contract, or did it provide for the sum of $25 *per day*?

The contract is ambiguous at this point, and we are confronted with the necessity of interpretation.

It is the contention of plaintiff that, inasmuch as the milk of the producer was delivered daily, there was necessarily a daily breach of the contract, and that this rendered the defendant liable

for $25 for each breach. In attempting an interpretation of the contract, the two questions here raised resolve themselves into one: Did the defendant's breach of the contract subject him to a liability of $25 as liquidated damages, or did it subject him to 66 times $25? The contract does not in terms provide for a liability of $25 *per day*. In order to insert into the contract the term "per day" a process of reasoning must be adopted as already suggested and an inference must be drawn therefrom. The contract is drawn from the articles of incorporation and speaks in the plural number of "members" and "contracts". It provides for a payment of $25 for each and every failure and breach. Does this mean any more than that the provisions of this contract shall apply to each and every member and to each and every contract? Reading this section as a part of the Articles of Incorporation it would seem. to mean that each and every breach of this contract shall subject the offending member to the payment of $25 as liquidated damages. It is the contention of the defendant that such is and was the construction put upon the contract by all the members and officers of the society during the ten years of its existence and up to the time of this controversy. It appears from the testimony of both sides that at no time prior to this controversy was it ever claimed by the society or by any of its members that more than $25 could be exacted from any member for his withdrawal from the society. It appears that in time past there had been several withdrawals in violation of the terms of the contract. In two instances, that of Steiner and Chittenden, $25 had been exacted from each of the offenders. $12 was exacted from Pressler. In the case of Steiner, the society was indebted to him for $30. The officers retained $25 as liquidated damages and remitted to him the balance of $5. Under the interpretation now insisted upon, the society could have exacted payment for an indefinite number of days with the same force and effect as they exact the same from the defendant herein. Why the plaintiff should limit its exaction to 66 days is not apparent, except that such is the number of days which transpired between the 15th of June and the date of commencing this action. If the defendant was liable for 66 times $25, he was equally liable for 67 times $25. Why should the liability be arrested by the unnecessary commencement of the suit? The suit could have been delayed at the will of the plaintiff until the maturity of the cause of action to its logical limits. The very act of the plaintiff in arresting the accrual of the cause of action

by bringing its suit is suggestive of the plaintiff's hesitancy to carry its interpretation of the contract to its goal. In view of the fact that the contract is ambiguous at this point, it was permissible to the defendant to show the interpretation, which the parties themselves had consistently put upon it up to the time of this controversy. It is clearly proven without substantial dispute that the present interpretation contended for was a recent discovery, and that never before had more than $25 been claimed from any offender. Indeed the record discloses that in at least a dozen cases of withdrawals no damages were exacted. It is quite the universal holding that, where the interpretation of a contract is fairly debatable, the court will adopt the practical construction which the parties to the contract have heretofore adopted, whether by conduct or otherwise. The following are some of the cases relied on by the appellant in support of the foregoing: Union Republican Co. v. Anderson, 211 Iowa 1, 232 N. W. 492; Cram v. Central Trust Co., 205 Iowa 408, 216 N. W. 71; Edwards v. Wagner, 191 Iowa 822, 183 N. W. 450; Tooey v. Percival, 192 Iowa 267, 182 N. W. 403.

There is a further reason in this case why we are moved to adopt the construction contended for by the defendant. This is that the interpretation contended for by the plaintiff would force us to the conclusion that the stipulated damage amounted to a penalty rather than liquidated damages.

Section 6 purports to provide for *liquidated damages*. The mere fact that the proviso is so denominated is not of itself sufficient to require a court of equity to so regard it. This is elementary. In order that specified damages shall be deemed as liquidated, it must appear that the sum provided for shall be "fairly related to the actual damages ordinarily suffered in like circumstances". Where it appears that the amount provided for is disproportionate and excessive, equity will reject the terms of the proviso and declare a penalty. If we adopt herein the interpretation contended for by the appellant, the proviso for liquidated damage becomes consistent with the contract, as a whole. On the other hand, if we adopt the interpretation contended for by the appellee, the proviso for damages becomes excessive, oppressive, and unconscionable. This is readily demonstrated by brief analysis of the contract. Under the articles and by-laws and under the contract, the right of withdrawal was confined to the end of the calendar year. The condition precedent was that notice should be given between November 15 and Novem-

ber 30. This latter condition was changed in the form of a by-law by the board of directors, which required, as a condition precedent to withdrawal, that notice should be given in the preceding May. Under the original condition precedent it was impossible for the plaintiff to withdraw before the end of the calendar year. Assuming that he could withdraw at that time upon serving notice in November, it would leave him subject to a daily penalty of $25 for six and one-half months. This period comprised approximately 200 days and a sum total of damages of approximately $5,000.

Assuming further that the action of the directors in fixing the month of May as the time of notice was valid, the defendant could not have perfected his withdrawal until the end of the year 1933. This would have kept him under daily assessment of $25 a day for one year and six and one-half months. This would amount to more than 500 days and would subject the defendant to a charge of more than $12,000. It is true that the plaintiff only sues for $1,650, and that its argument is predicated upon that amount as a reasonable liquidated sum; but the restriction of its claim to $1,650 was purely voluntary on its part. Under the terms of the contract, as the plaintiff interprets them, the plaintiff was under no such restriction. If we sustain the plaintiff's interpretation, we must face the language of the contract as so interpreted. The plaintiff was not required to bring its suit on the 9th of September, 1932, under the terms of the contract, as the plaintiff interprets them. Under such interpretation the defendant was just as liable for an additional $25 on September 10 as he was upon September 9. Inasmuch as that the plaintiff does not contend that the sum of $12,000 or the sum of $5,000 could be considered by a court of equity as liquidated damages, we need not spend time upon the question. The most that the plaintiff contends for is that $1,650 was not disproportionate. This contention is quite beside the mark. This contract must be interpreted either (1) as providing for damages to the amount of $25, plus a certain deduction of 5 cents per hundred pounds; or (2) for a sum ranging from $4,000 up. If we were now to sustain the interpretation contended for by the plaintiff, the next offender could be charged to the extent herein indicated.

We hold that the practical construction put upon this proviso by the members and officers of this society at all times prior to the present controversy was that the offender was subject to a charge of $25 as liquidated damages, plus the other stated items which are

not involved in debate herein. Such construction must be adhered to now.

The judgment below must accordingly be reversed.

ALBERT, C. J., and KINDIG, DONEGAN, and CLAUSSEN, JJ., concur.