L. P. MARTIN, appellee, v. A. W. MOELLER & SON (GEORGE), individually and as partners under the firm name of A. W. MOELLER & SON, appellants.

No. 47714.

(Reported in 44 N.W.2d 345)

OCTOBER 17, 1950.

Gray & Gray, of Rockwell City, for appellants.

F. Wendell Miller, of Rockwell City, for appellee.

SMITH, J.:—This case involves interpretation of a contract under which plaintiff raised and sold 3910.6 bushels of hybrid

seed corn under a contract that provided: *"The Purchaser agrees to pay to the Grower [plaintiff] on all accepted corn the full amount per bushel plus premium of 25c per bu. above the local price of No. 2 Yellow shelled corn. Choice of the market to be selected by the Grower between November 15th, 1948, and May 15th, 1949; if no selection is made by May 15th, the market on that day shall be accepted."*

Plaintiff contends the words "local price" and "market" permit him to select the amount per bushel offered by the United States Department of Agriculture Commodity Credit Corporation for sealing corn or entering into a purchase agreement for future delivery. Defendants argue those words "refer to a price or value in an open market created as between one who desires but is not compelled to buy and one who is willing but not compelled to sell." Reducing their own formula to practical terms, defendants argue the contract means "elevator price."

That is the lawsuit. The facts are mostly stipulated, subject to appropriate objections. The "sealing price" was $1.35 and the "elevator price" $1.15 per bushel on May 5, 1949, the date chosen by plaintiff. Under the contract, therefore, plaintiff was entitled to $1.60 per bushel according to his construction or to only $1.40 under defendants'. The trial court adopted plaintiff's interpretation and rendered judgment accordingly. Defendants have appealed.

Plaintiff offered in evidence the form of "Purchasing Agreement" used by the Commodity Credit Corporation under which the corporation would loan the grower (landowner or tenant) on corn sealed in crib on the farm the fixed "sealing" price. Under it the borrower could either sell (if he could find a buyer to pay more than the "sealing" price) and pay off the loan in cash, or he could, on the day his loan fell due, tender the corn to the corporation in payment of the loan.

I. It is shown the parties had dealt in previous years (in 1946 at least, under a written contract similar to the one in question here) and plaintiff on those occasions chose and was paid the elevator price. But it also is shown that in those years the elevator price was higher than the sealing price.

Defendants argue that the practical interpretation thus placed on the contract by the parties themselves in the past is

the best indication of their intent in entering into it, citing Dalton v. Treinen, 191 Iowa 1185, 181 N.W. 437, Tooey v. Percival Co., 192 Iowa 267, 182 N.W. 403, and Winfield State Bank v. Snell, 208 Iowa 1086, 226 N.W. 774; that such construction is entitled to great, if not controlling, weight, citing Frank Cram & Sons v. Central Trust Co., 205 Iowa 408, 216 N.W. 71; and that the courts will follow such practical construction, citing Bowman v. Swanwood Coal Co., 201 Iowa 1236, 207 N.W. 591.

These propositions are sound but they do not solve the present controversy. Plaintiff claims the terms of this contract permit him to choose *either* sealing price or elevator price. Naturally he would choose the higher which in former years was the elevator price. His choice would not be an interpretation that he was compelled to resort to the price chosen.

The language of the contract certainly gives the purchaser a *choice* of markets and that recognizes the possibility of more than one to choose from. Defendants would interpret it as a choice between "elevator" prices varying from time to time—a choice of the *day* whose "elevator" price he would receive. Plaintiff's argument implies, on the contrary, the possibility of more than one kind of price from which to choose as well as the day on which the selection would be made.

II. Examination of the briefs, as well as our own research, convinces us we are dealing with a problem without precedent in the books. As well said by the trial judge in his opinion (which we are tempted to set out verbatim as our own) :.

"It is obvious the problem * * * is not only new but one created by governmental policies not anticipated when the contract form used by the parties was originally prepared. It may be that changing governmental policies and artificial price supports do violence to former customs and preconceived notions. That fact alone, however, * * * certainly cannot support a denial of their existence and their import.

"New statutes, new programs and changed marketing conditions create new elements which must be considered in construing contractual obligations. The law recognizes these changes and attempts to integrate them into our legalistic thinking."

Again the trial judge says:

"When, pursuant to its authorization and in conformity with the intent of the Congress to support prices, the Commodity Credit Corporation comes into Calhoun County and establishes an amount expressed in dollars per bushel that a farmer may obtain for his corn it thereby establishes a local price. It may not be the only price. It may be artificial. It may be intended as a support only. It may differ from other prices but it is a price. It is local and it is generally available to producers."

III. It would seem the sealing price came as near being "local" as did the elevator price. There is no pretense that the latter is a price created by local supply and demand or by local buying and selling. It rather represents a price determined by transactions at some distant general market with differential adjustment to absorb cost of transportation from the local to the distant. It is a price the elevator is willing to pay.

The fair meaning or intent of the contract was to insure to plaintiff a premium of 25¢ per bushel above what he could realize from the product on any selected date. Plaintiff could have realized the $1.35 price for No. 2 Yellow corn. The market was available to him at that price without limitation as to quantity.

Defendants had the right to test and select and accept what met seed requirements. For this privilege they agreed to pay the 25¢ per bushel premium, furnish the original seed stock, pay for picking and furnish machinery and labor for harvesting the female rows (constituting the seed corn), and portable equipment for sorting the corn was loaded on trucks.

Plaintiff was to furnish the ground, plant, cultivate and harvest the crop, pick the border rows prior to regular harvest time and furnish power, labor and hoist for hauling the seed rows out of the field and elevating the corn to the trucks.

The record does not show how much of the corn raised that season was retained by plaintiff or how much of what was retained rated No. 2 Yellow. Whatever the quantity was he could have received $1.35 per bushel by sealing, under the Commodity Credit Corporation contract. That was a market available to him. It hardly seems reasonable to presume any less price than that was intended as the base price of the contract with defendants.

IV. Defendants argue the "sealing price" could not have been intended because plaintiff had no corn to deliver on May 5, 1949, the date he selected as fixing the "local price" to which the 25¢ premium would be added. By the same argument the "elevator price" on that day would also be unavailable. But the date to be selected was not the delivery date. The corn was delivered the fall before. The significance of the selected date was to fix the price as of that day by which payment would be made.

We think the decision of the trial court was right. The contract was executed in the light of the price-support legislation of which all parties are presumed to have known. The very purpose of that legislation was to place a floor beneath corn prices. It was called a "sealing," but actually it was also a "selling" price. The law was designed "for raising farm prices to parity levels." Parker v. Brown, 317 U. S. 341, 358, 63 S. Ct. 307, 317, 87 L. Ed. 315. We are not concerned with the soundness of the law as a question of economics nor, for that matter, with its constitutionality. That has been established by appropriate authority in spite of former concepts of Congressional power. The impact of the legislation upon the present contract is clear.

The decision of the trial court is affirmed.—Affirmed.

GARFIELD, C.J., and HALE, BLISS, OLIVER, MANTZ, and MULRONEY, JJ., concur.

WENNERSTRUM and HAYS, JJ., dissent.