NORMA L. MERRICK, executrix of estate of C. I. MERRICK, appellant, v. DELAVAN ENGINEERING COMPANY et al., appellees.

No. 47868.

(Reported in 50 N.W.2d 586)

40

December 13, 1951.

Steward & Crouch, of Des Moines, for appellant.

William L. Hassett and D. J. Fairgrave, both of Des Moines, for appellees.

Oliver, C. J.—Defendant Delavan Engineering Company is a Des Moines partnership composed of six members who are joined with it as defendants. For convenience, the partnership will be referred to herein as defendant. Defendant is manufacturer's agent or sales representative in several midwestern states for certain manufacturers of electrical, mechanical, heating, refrigeration, air conditioning and lighting equipment, etc. Such representation is exclusive and defendant is entitled to a com-

mission from each manufacturer varying from three per cent to twenty-five per cent on all sales made in the territory allotted to defendant.

The customer may give an order to defendant's salesman or send it to defendant or direct to the manufacturer. Some time after the manufacturer receives the order it sends an acknowledgment of the order to the customer and a copy to defendant. Many of the orders are later changed, canceled, increased, decreased or recomputed as to price. Frequently the amount of the order or commission cannot be computed from the acknowledgment. Some of the acknowledgments are not priced. In those cases defendant sometimes estimates the value of such orders. Occasionally defendant is required to divide a commission with others. Hence, only an approximation of the amount of the orders, when delivered, and the amount defendant will receive as commission can be made from the acknowledgments. The evidence shows defendant does not enter these acknowledgments on its books of account but keeps a record of them, which it calls "New Business," as a guide to indicate the volume of orders accepted by the manufacturers. Aside from these acknowledgments defendant keeps no record of orders.

The commission on a sale is not due defendant until the manufacturer has shipped or installed the equipment ordered and has received payment therefor. After the manufacturer is paid it sends a check for defendant's commission. It is usually a number of months and frequently many months after an order is taken before the order is delivered and defendant receives its commission. Upon receiving it defendant enters the amount upon its books of account as gross profit. In effect, defendant's books are kept upon a cash basis for the bulk of its business. In a few minor cases defendant ships material ordered by the customer from its branch warehouse in Des Moines. In such cases at the time it issues the invoices defendant enters in its books of account its profit (commission) on such sales.

Plaintiff's decedent, C. I. Merrick, was a graduate electrical and mechanical engineer with considerable experience in the public utility field. He served in the Army through World War II and was discharged with the rank of Major, August 3, 1945. He rested until December 10, when defendant Delavan Engi-

neering Company employed him as a salesman. During the remainder of the year 1945 he worked with his predecessor, Mr. Morgan, to familiarize himself with the position. He took over the position January 1, 1946, and remained until May 3, 1946, when he was notified his employment was terminated and was given pay in advance to May 18, 1946. He continued until May 18 "on a more or less inactive basis."

This action was instituted by Mr. Merrick in June 1947. The petition alleged an oral contract of employment: "That defendants would pay the plaintiff the sum of $325 per month, expenses and a bonus" for plaintiff's services as salesman; that plaintiff worked under said contract from December 10, 1945 until May 18, 1946, at which time defendant discharged him "and refused to permit him to perform any further services under said contract, and thereupon refused to acknowledge their said agreement"; that during the period of his employment plaintiff sold machinery and equipment in the gross amount of $139,553.85 by reason of which he became entitled to a bonus of $2602.99; for which amount he demanded judgment.

In the fall of 1947 Mr. Merrick died. Some time later Mrs. Merrick, his executrix, was substituted as plaintiff. Before the trial in 1950 she amended the petition by adding thereto a separate Count II in which it was alleged defendants discharged Merrick "without justifiable cause in order to save the expense of the decedent's salary, and to deprive the decedent of the bonus he would have received from the orders already taken had he been permitted to continue in the defendants' employ. * * * That, but for the discharge of the plaintiff's decedent without justifiable cause, he would have been entitled to a bonus of $2602.99 on his sales and orders made and taken up to the date of his discharge * * *."

During the trial the petition was amended by changing the amount demanded to $3024.96.

The record is without substantial dispute. Plaintiff-executrix testified to Mr. Merrick's education and experience, that his employment for defendant covered territory in Iowa, Nebraska and South Dakota, and his efforts were largely devoted to sales to R. E. A. organizations. The other witnesses for plaintiff were

two of the defendant partners, Mr. Delavan and Mr. Goreham. The latter was the only witness for defendant.

Each salesman for defendant is assigned a group of related lines for which he is responsible. Such a group is frequently called a division. Mr. Merrick's division consisted of seven manufacturers in the electrical field.

The bonus plan, upon which plaintiff's claim is based, was adopted by defendant in February 1944 and has since been in effect. It applies to various salesmen. The bonus plan is evidenced by a blueprint which shows what it calls the SALESMAN'S BONUS CURVE based upon "NET PROFITS OF DIVISION FOR YEAR", in excess of $1200. The blueprint recites:

"Curve Formulae:—

"BONUS, % of net profits $= \dfrac{\text{Net profits in \$}}{440} + 17.2727$ for

N. P. of $1200.00 to $10,000.00

"BONUS, % of net profits, on net profits over $10,000.00 per year, is 40%.

"This curve shows salesman's percentage of the net profits of his division after salary, traveling expenses and his proportion of company overhead have been deducted from the gross income of the lines that are included in his division."

Mr. Merrick worked under the bonus plan from January 1, 1946. Defendant kept a separate, individual bonus chart for each salesman who was under the bonus plan. Defendant's sales manager went over this chart with Mr. Merrick each month and Mr. Merrick must have been familiar with it.

On the upper part of the chart was shown the income (commissions) received each month from each manufacturer in Merrick's division. These figures for each month were totaled and were designated Total Income. Below this were three rows of figures showing Merrick's monthly salary, traveling expenses and overhead. These figures were totaled and the result was designated Total Expense. Immediately below this was another line of figures secured by subtracting the total expense from the income. This row of figures was designated Net Profit. All of the figures above-mentioned were taken from the books of account of the partnership. Defendant contends the language of the blue-

.print requires that the bonus be computed upon these figures. The chart showed total income of about $4300 for the period and total expense about $500 in excess of this. The bulk of the income was from sales made before Mr. Merrick was employed by defendant.

On the lower part of the chart was a row of figures designated New Business. These figures showed the total or approximate total of the orders acknowledged by the manufacturers in that division for that month. The acknowledgments from manufacturers in Merrick's division from January to May totaled approximately $140,000. Immediately below was another row of figures designated Estimated Income on New Business 9%. These figures are nine per cent of the so-called New Business (acknowledgments). The actual commissions on sales of each line vary from three per cent to twenty-five per cent and this Estimated Income of nine per cent of the acknowledgments would show approximately the profits (commissions) which could be anticipated from the acknowledged orders. Plaintiff contends the Estimated Income constitutes total income or gross income from which Mr. Merrick's bonus should be computed.

Each salesman is given credit on his bonus chart for the full amount of income for his division, whether he or his predecessor was responsible for the orders. He secures the benefit of orders antedating his employment but there are many details to be handled by him. In turn, his successor inherits the benefit of outstanding orders upon which the manufacturer has not paid commissions when the successor takes over. Unpaid commissions are not shown on defendant's books of account.

As already stated, the bonus chart for Mr. Merrick's division showed a net loss for the period of his employment. These figures were based upon defendant's books of account. Shortly after his discharge Mr. Merrick prepared and presented to defendant a bonus sheet in which he claimed a bonus apparently based upon acknowledgments of orders, as shown in the lower part of the bonus chart. This sheet recited:

"New Business    Jan 1–May 18         139,553.85"
also:

"Est. gross income Jan 1–May 18   9% of 139,553.85   12559.85"
From this Estimated gross income were deducted the charges

listed in the bonus blueprint leaving "Bal. income after charges 8029.08". From this figure deduction was made for the proportionate amount of the $1200 deduction provided by the blueprint, leaving $7562.42 upon which, by the use of the salesman's bonus curve or formula, a bonus of $2602.99 was figured.

The petition filed herein alleges Merrick sold machinery and equipment in the gross amount of $139,553.85 by reason of which he became entitled to a bonus of $2602.99. These claimed sales by Merrick were merely acknowledgments received by defendant. They included about $17,000 acknowledged in January. The record shows, without dispute, that the major portion of the so-called January sales was, in fact, acknowledgments of orders taken in December or some previous month when Mr. Morgan was in charge of the division and prior to Mr. Merrick's employment. Furthermore, the evidence shows defendant had in its files contracts for some other large orders upon which Mr. Merrick's claim was based in part, which orders had been actually signed between the customer and defendant prior to 1946, but acknowledged by the manufacturer during the five-month period in 1946. A large part of the equipment ordered during the period was by R. E. A. co-operatives. There were delays of one to three months in acknowledgments of those orders because formal approval from Washington was required. Again, the record shows some of the large orders carried only a five per cent commission and that seven per cent rather than the estimated nine per cent would be a fair over-all average commission for the orders acknowledged while Merrick had charge of the division.

Mr. Merrick called upon public and private power companies, contractors in those fields and electrical jobbers. Much of the business was done with R. E. A. co-operatives. Mr. Morgan had been working on this business since 1944 but because of the war it was difficult for customers to place orders for materials other than for maintenance and repairs. The war ended in 1945 and immediately some of the controls began to be relaxed and the R. E. A. co-operatives were able to secure approval for orders for new lines. Various new rural electricals started. Mr. Morgan had many projects pending.

A large part of the so-called new business shown on Mr. Merrick's chart "was the result of Mr. Morgan's efforts. * * *

those figures are not orders taken by the man. They are simply the record of a going business where we have been calling on the accounts for a long period of time and if they order we get credit because we have an exclusive territory. The salesman does not necessarily pick up the order, he doesn't sell the merchandise, only in a few cases." Mr. Merrick took very few orders, personally. Much of the R. E. A. business was secured by competitive bidding. A large part of this consisted of orders for large transformers to be manufactured. That operation normally requires a few months and was further delayed by material shortages and a backlog of orders.

I. Count II of the petition was based upon the allegation Mr. Merrick was discharged without justifiable cause. The answer denied the charge. Practically all the direct evidence upon this issue came from Mr. Delavan as a witness for plaintiff. He testified: "Q. Did you find Mr. Merrick to be a good producer in his division? A. Ultimately not, of course, or we would not have been interested in separating our connection with him. * * * if we had felt he was doing a grand job we would have wanted to continue with him. * * * Mr. Merrick left our employment about May 18, 1946. I indicated that was because we had been dissatisfied with the way the line had been handled or what had been produced by his handling of the line."

Obviously, this evidence does not tend to sustain the allegation Mr. Merrick was discharged without justifiable cause. It indicates there was proper cause for his discharge. However, plaintiff's argument overlooks this evidence and it is contended the circumstances justify an inference to the contrary which makes an issue of fact. One such circumstance asserted is Mr. Merrick obtained a large volume of contracts. We have already referred to uncontradicted proof these so-called contracts were in fact acknowledgments sent by the manufacturers and a substantial part of the orders had been given in 1945, prior to Mr. Merrick's tenure; that defendant had an established business, had been contacting various accounts for years and Mr. Merrick's predecessor had many projects pending; that after the war ended in August 1945 many restrictions were lifted and there was a great demand for certain equipment handled by this division.

Plaintiff argues also, "This equipment was in short supply

and it is a fair inference that the plaintiff had already obtained all the contracts that could be filled during the ensuing year and that the defendants terminated his services in order to avoid paying him the very substantial bonus which he was obviously going to earn and to turn this very profitable line over to one of the partners, Mr. Dean." Again plaintiff's argument overlooks the testimony of plaintiff's witness. Although some of the equipment was in short supply and the manufacturers had a heavy backlog of orders, that merely delayed the filling of new orders. Mr. Goreham testified for plaintiff, "Q. Did that situation enter into Mr. Merrick's leaving the Company? A. No." There was no testimony to the contrary.

█ Plaintiff's theory that defendant did not want business which could not be completed during the current year is untenable, and the contention Merrick was discharged to avoid paying him a bonus and to give his profitable division to one of the partners is without support in the record. Plaintiff failed to present any substantial proof Mr. Merrick was discharged without justifiable cause. Hence, the order of the trial court directing the verdict against plaintiff on Count II of the petition was correct.

II. Count I of the petition demands recovery of a bonus based upon alleged sales by Mr. Merrick amounting to $139,-553.85. The evidence plaintiff relied upon is that during the period of Mr. Merrick's employment acknowledgments of orders of approximately that amount were received by defendant. The record shows a substantial part of these orders was taken before Mr. Merrick was employed by defendant. Under the theory of the petition Mr. Morgan, not Mr. Merrick, would be entitled to bonus credit for such prior orders. Plaintiff's argument overlooks this part of the record and claims all the acknowledgments, amounting to about $140,000, were "plaintiff's sales." Plaintiff would also take the benefit of orders made before Mr. Merrick entered the employment. Her argument states: "In any event the plaintiff was entitled to credit for all sales and orders in his division."

█ However, the basic issue is whether the bonus was based upon sales. This action is founded upon the bonus contract evidenced by the blueprint. The rights of the parties must be

governed by the contract. The blueprint states the salesman's bonus curve, shown thereon, is based upon the net profits of the division for the year, and shows the salesman's percentage of the net profits of his division after his salary and traveling expenses and the overhead have been deducted from the gross income of the division. It states in so many words the bonus is based upon net profits (not sales or orders) of the division and what expenses shall be deducted from gross income to determine net profits.

Plaintiff concedes this is the language of the bonus contract here involved but contends the gross income should be computed upon the acknowledgments of orders. It will be remembered the top part of the bonus chart for this division set out the total income expenses and net profit as shown by defendant's books of account. The lower part of the chart showed the orders acknowledged for each month and the nine-per cent estimated income thereon. (In his written claim for a bonus Mr. Merrick listed this item as "Est. gross income.")

Plaintiff contends the estimated income figures show the gross income of the division. We hold this contention is without merit.

██ ██ Income is a broad and comprehensive term which has been frequently defined by the courts with some variations, depending upon the context. 42 C. J. S. 529, states: "Generally or ordinarily the term means all that comes in; something coming in, something which is paid over and delivered to the recipient * * *; that which comes in, or is received from any business or investment of capital * * *." Webster's Unabridged Dictionary states: "The total receipts for any branch of business are known as gross income." The same authority gives a definition of "profit" as "the net proceeds (called net profit) obtained by deducting from the gross proceeds all forms of expense or outlay incidental to the business in question."

In Tooey v. C. L. Percival Co., 192 Iowa 267, 182 N.W. 403, plaintiff was manager of defendant's paper and woodenware department at a stipulated salary plus twenty-five per cent of the net profits of the department. The term net profits was not defined. Among other things, plaintiff claimed net profit in 1916 on orders for merchandise which had not been shipped December 31, 1916, and were subject to cancellation. The decision states:

"What would the bookkeeper do with an order for merchandise, and what would his books show on December 31, 1916, as to such orders? Under the testimony, he did not enter such orders upon the books as a sale of merchandise until shipment was actually made. Therefore, the balance sheet would not include such sales, and the net profit would neither be increased nor diminished by having such orders on file. The merchandise account would be credited only when the goods were shipped." (Page 270.)

"To hold otherwise in these particulars, as a matter of practical bookkeeping, the plaintiff would be securing a percentage of the net profits which we might expect to appear on the balance sheet of the company for the year ending 1917. This surely was not within the contemplation of the parties or within the terms of the contract. * * * The principles of the science of bookkeeping restrict the net profits of any business to such profits as have been reduced to actual possession, in the form of cash or its equivalent, by completed sales." (Page 271.)

"The word 'income' means what has come in. It must have been received. 'Net profits' mean the difference between the 'income' and the 'outgo,' and this must be computed on consummated sales, and not on mere orders, subject to cancellation, or from which nothing may ever be received." (Page 273.)

Defendant is a sales agent for manufacturers. In a few minor cases in which it has the goods in its warehouse and makes shipment from there, defendant shows the sales and the profits on its books of account at the time it issues the invoices and before payment by the customer. In such cases the proper division is credited with the sale and profit as though defendant had received payment in cash from the customer. But in almost all cases defendant merely receives from the manufacturer an acknowledgment of the order, which defendant may or may not have taken, and does such detail work as may be required in connection with it. The manufacturer ships the equipment direct to the customer and the latter makes payment direct to the manufacturer.

Defendant is paid its commission by its principal only if sales are made, shipped, billed and paid for by the customer. The commission payments defendant receives are income and are

properly shown upon its books of account as such and credited to the proper division. The acknowledgments of orders may result in income from commissions in a period of from a few weeks to two years. However, they are not income. Tooey v. C. L. Percival Co., supra, 192 Iowa 267, 182 N.W. 403. They represent orders which are subject to change and cancellation, the ultimate amount of which orders and the commissions thereon are not definitely fixed. The figures plaintiff relies upon as showing income are designated Estimated Income. It would be neither practical nor proper bookkeeping to attempt to keep books of account on the basis contended for by plaintiff.

Plaintiff cites Kollman v. McGregor, 240 Iowa 1331, 39 N.W.2d 302; Roberts v. Mays Mills, Inc., 184 N. C. 406, 114 S.E. 530, 28 A. L. R. 338; annotation in 28 A. L. R. 346; 35 Am. Jur., Master and Servant, section 80, pages 511, 512. Most of these authorities involve the discharge of the employee without proper cause, which deprived him of a partly earned bonus. In the case at bar the discharge was not shown to be without sufficient cause. Nor did it deprive Mr. Merrick of a partly earned bonus.

It is contended the acknowledged orders in the case at bar were not cancellable. The record shows orders were cancellable, at least in most cases. Authorities which involve a bonus or a commission on sales are not here applicable. In this case the bonus plan contemplated the payment of a bonus based upon the net profits of Mr. Merrick's division. The action was to recover a percentage of net profits already realized. The record shows without dispute there were no net profits. Hence, the trial court properly directed a verdict against plaintiff on Count I of her petition.—Affirmed.

SMITH, WENNERSTRUM, MANTZ, MULRONEY, and THOMPSON, JJ., concur.