**KAYDON ACQUISITION CORP., Plaintiff,**

v.

**CUSTUM MANUFACTURING, INC., f/k/a Gold Star Manufacturing, Inc., America Central Industries, Inc., Lloyd Mefferd, and Floyd Mefferd, Defendants.**

No. C 03–3004–MWB.

United States District Court, N.D. Iowa, Central Division.

Feb. 11, 2004.

Edward M. Mansfield, Holly M. Logan, James R. Swanger, Michael R. Reck, Belin, Lamson, McCormick, Zumbach, Flynn, Des Moines, IA, for Plaintiff.

Paul D. Lundberg, Lundberg Law Firm, Sioux City, IA, Redge O. Berg, Spencer, IA, for Defendants/Counter Claimant.

James R. Swanger, Belin, Lamson, McCormick, Zumbach, Flynn, Des Moines, IA, for Counter Defendant.

**MEMORANDUM OPINION AND ORDER REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT**

BENNETT, Chief Judge.

## TABLE OF CONTENTS

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .949

 A. Factual Background ..................................................949
 B. Arguments Of The Parties ..........................................952

II. LEGAL ANALYSIS ........................................................953
 A. Standards For Summary Judgment ..................................953
 B. Principles Of Iowa Indemnity Law .................................954
 C. Kaydon's Indemnity Claim .........................................956
 1. Applicability of the indemnity provisions to the Irgens litigation .....956
 2. What were the Mefferd Defendants required to do? ...................957
 a. Was there a duty "to defend"? ................................957
 b. Was there an "on-going duty" to pay attorneys' fees and costs? .....958
 3. Anticipatory repudiation ..........................................961
 a. Repudiation based on "on-going duties" .......................961
 b. Repudiation based on assertion that Kaydon was the "wrong
 party" ....................................................962
 c. Repudiation based on a statement of inability to perform .........962
 4. Kaydon's failure to obtain consent to settlement ....................964
 a. The "written consent" clause .................................964
 b. The "context" of the clause ..................................965
 c. Effect of settlement without written consent ....................966
 5. "Absurd" and "unreasonable" result ...............................966

III. CONCLUSION ............................................................969

This is an action for indemnity, filed January 16, 2003, by plaintiff Kaydon Acquisition Corporation (Kaydon) against defendants Custum Manufacturing, Inc., formerly known as Gold Star Manufacturing, Inc., American Central Industries, Inc. (ACI), and Lloyd and Floyd Mefferd (collectively, the Mefferd Defendants), following settlement of a products liability action against Kaydon, the Mefferd Defendants, and others in California state court. This matter comes before the court pursuant to the Mefferd Defendants' December 8, 2003, motion for summary judgment (docket no. 13), and Kaydon's January 4, 2004, cross-motion for summary judgment (docket no. 14). The court heard oral arguments on the parties' cross-motions for summary judgment on February 6, 2004. At the oral arguments, Kaydon was represented by Edward M. Mansfield of Belin, Lamson, McCormick, Zumbach, Flynn, P.C., in Des Moines, Iowa, and the Mefferd Defendants were represented by Paul D. Lundberg of the Lundberg Law Firm,

P.L.C., in Sioux City, Iowa. The pending motions are now fully submitted.

## I. INTRODUCTION

### A. Factual Background

Rather than attempt an exhaustive survey of the facts, undisputed and disputed, in this case, the court will provide here sufficient factual background to the parties' dispute to put in context their arguments concerning their cross-motions for summary judgment on Kaydon's indemnity claim against the Mefferd Defendants. Additional facts, or factual disputes, will be discussed as they become relevant in the court's legal analysis.

The parties agree that Kaydon acquired the assets of the Mefferd Defendants' hydraulic cylinder manufacturing business on March 11, 1997, under an Asset Purchase Agreement with the Mefferds, American Central Industries, Inc., and Custum Manufacturing, Inc., d/b/a Gold Star Manufacturing, Inc.[1] As to indemnity of the sellers, *i.e.*, the Mefferd Defendants, the pertinent

---

1. The parties agree that Custum Manufacturing, Inc., has since been dissolved.

provisions of the Asset Purchase Agreement provided as follows:

12.2 *Indemnification by Seller.* Seller, ACI and the Mefferds shall, jointly and severally, *indemnify and hold* Buyer (and its shareholders, directors, officers, employees and affiliates) *harmless* from and against any and all claims, liabilities (including any strict liabilities with respect to any Loss specified under clause (iv) below), fines, penalties, natural resource damages, losses, damages, (including incidental or consequential damages such as lost profits resulting from any disruption of operation of the Assets), costs and expenses (including costs and counsel fees) incurred by Buyer from or related to any of the following (hereinafter called a "Loss" or "Losses"):

\* \* \* \* \* \*

(iii) any product liability claim or other claim for the breach of any express or implied warranty, and any other claim of whatever nature, and from all damages resulting therefrom, which may be made in connection with the sale of products manufactured by Seller prior to the Closing Date[.]

Defendants' Appendix at 29 (emphasis added). Certain additional provisions of the Asset Purchase Agreement apply to the prosecution and settlement of claims to which indemnity may apply:

12.4 *Indemnification Notice, etc.*

(a) If any action, suit or proceeding shall be commenced, or any claim or demand shall be asserted, in respect of which a party entitled to indemnification pursuant to this Agreement (the "Indemnitee") demands indemnification under this Section 12, the party from which such indemnification is demanded under this Section 12 (the "Indemnitor") shall be notified to that effect with reasonable promptness and *shall have the right to assume entire control of its*

*defense* (including the selection of counsel), subject to the right of the Indemnitee to participate (with counsel of its choice) in, the defense, compromise or settlement thereof.

\* \* \* \* \* \*

(c) The Indemnitee shall cooperate fully in all respects with the Indemnitor in any such defense, compromise or settlement, including, without limitation, by making available all pertinent information under its control to the Indemnitor. The Indemnitor will not compromise or settle any such action, suit, proceedings, claim or demand without the prior written consent of the Indemnitee; provided, however, that in the event such consent is withheld, then the liabilities of the Indemnitor shall be limited to the total sum representing the amount of the proposed compromise or settlement and the amount of counsel fees accumulated at the time such consent is withheld. *The Indemnitor shall not be liable for any settlement by Indemnitee of any action, suit, proceedings, claim or demand, unless the Indemnitee obtains the prior written consent of the Indemnitor.*

Defendants' Appendix at 30–31 (emphasis added).

By letter dated August 17, 2001, Kaydon "demand[ed] that [the Mefferd Defendants] indemnify and hold Kaydon harmless pursuant to Paragraph 12.2 of the Asset Purchase Agreement" in litigation brought by James and Robert Irgens against Kaydon in the Superior Court of California for the County of San Diego arising from the alleged malfunction of a cherry picker, which utilized a hydraulic cylinder manufactured by the Mefferd Defendants prior to March 11, 1997. *See* Defendants' Appendix at 36. Although this initial demand to "indemnify and hold harmless" tracks the language of Para-

graph 12.2 of the Asset Purchase Agreement, in a subsequent paragraph of the letter, Kaydon "demand[ed] that [the Mefferd Defendants] defend and indemnify it in relation to this matter." *Id.* The letter continued,

> Please note that if [the Mefferd Defendants] do not assume Kaydon's defense in this matter in a timely manner, Kaydon will provide its own defense and initiation [sic] litigation against the indemnitors to recoup the expenses incurred in relation to the above litigation, including all costs and attorneys fees.

*Id.* at 37. Thus, Kaydon demanded not only "indemnity," but a "defense" by the Mefferd Defendants.

By letter dated August 21, 2001, counsel for the Mefferd Defendants advised Kaydon that he "d[id] not understand how Kaydon could have been brought into this lawsuit [by the Irgens plaintiffs] as a party"; advised Kaydon to argue that Kaydon was not a proper party; and stated that "[i]t is further our position that there is no indemnity in this instance, because Kaydon is obviously not an appropriate party," where Kaydon did not purchase the Custum Manufacturing corporation, but only its assets and a few specifically identified liabilities. *See* Kaydon's Appendix at 185–86. The record does not show whether Kaydon ever challenged its status as a party to the Irgens litigation, as suggested by the Mefferd Defendants, based on the theory that Kaydon did not purchase the liabilities of Custum Manufacturing, and thus was not a true "successor" to Custum Manufacturing, where the hydraulic cylinder in question was undisputedly manufactured before Kaydon bought the Mefferd Defendants' assets.

Although the Mefferd Defendants were eventually added as defendants in the Irgens litigation, Kaydon and the Mefferd Defendants were represented by separate counsel for almost all of that litigation.

The parties agree that, despite several additional demands from Kaydon that the Mefferd Defendants both "defend" and "indemnify" Kaydon, the Mefferd Defendants did not assume Kaydon's defense, except temporarily from January to April 2002, at the end of which time the Mefferd Defendants fired their attorney, and Kaydon resumed its own defense. Thus, the Mefferd Defendants declined to defend or indemnify Kaydon while the Irgens litigation was pending. The Mefferd Defendants also expressly declined to pay for any defense experts concerning the Irgens plaintiffs' injuries or damages. The Mefferd Defendants admit in this litigation that they refused to defend or provide indemnification to Kaydon, with the exception of the brief period in 2002 during which they assumed Kaydon's defense.

The parties to the Irgens litigation eventually held a pre-trial settlement conference. Kaydon or its insurance carrier ultimately settled the Irgens plaintiffs' claims against Kaydon for $350,000, and the Mefferd Defendants ultimately settled the Irgens plaintiffs' claims against them for $15,000. At no time did Kaydon obtain the Mefferd Defendants' written consent to Kaydon's settlement of the Irgens litigation. After the parties reached these settlements with the Irgens plaintiffs, Kaydon filed a motion pursuant to California procedure for a determination by the court that its settlement had been in good faith. Although the Mefferd Defendants filed an opposition to Kaydon's motion, the California court granted Kaydon's motion, holding that Kaydon's settlement was reasonable.

Upon the conclusion of the Irgens litigation, Kaydon initiated this action for indemnity against the Mefferd Defendants. Ultimately, both parties to this litigation moved for summary judgment on Kaydon's indemnity claim.

### B. Arguments Of The Parties

The Mefferd Defendants, the first movants for summary judgment, argue that Paragraph 12.4(c) of the Asset Purchase Agreement unambiguously provides that the Mefferd Defendants "shall not be liable" for any settlement made by Kaydon unless Kaydon obtained the prior written consent of the Mefferd Defendants. They argue, further, that such "written consent" provisions are routinely enforced in Iowa, and that there is no genuine issue of material fact that they never waived the "written consent" requirement. Therefore, the Mefferd Defendants argue that they cannot be liable for indemnity for Kaydon's settlement of the Irgens litigation, because Kaydon failed to obtain the Mefferd Defendants' written consent to that settlement. They also argue that Kaydon's contention that the settlement of the Irgens litigation was reasonable is simply irrelevant, in light of the unambiguous terms of the indemnity contract requiring the Mefferd Defendants' consent before they could be liable for indemnity for Kaydon's settlement. The Mefferd Defendants also point out that Kaydon's representatives drafted the pertinent provisions of the Asset Purchase Agreement and that there was no negotiation of those provisions prior to the parties' execution of the Agreement, such that those provisions should be construed against Kaydon. Finally, the Mefferd Defendants argue that other portions of Paragraph 12.4(c) demonstrate that Kaydon could have protected itself in the event that the Mefferd Defendants unreasonably refused to consent to a settlement, but that Kaydon did not include such protections in the clause requiring the Mefferd Defendants' written consent to settlement by Kaydon.

In support of its resistance to the Mefferd Defendants' motion for summary judgment and in support of its own cross-motion for summary judgment, Kaydon argues, in essence, that the Mefferd Defendants cannot rely on the "written consent" provisions, where the Mefferd Defendants were the first to breach the parties' contract by refusing to defend and indemnify Kaydon for the Irgens plaintiffs' claims. To put it another way, Kaydon argues that the "written consent" requirement in the contract only had to be followed so long as the Mefferd Defendants were honoring their obligation to indemnify Kaydon, which Kaydon contends they were not doing, because they were refusing to defend Kaydon in the Irgens litigation. Kaydon contends that there is no genuine dispute that the Mefferd Defendants failed to defend and/or indemnify Kaydon; that the settlement Kaydon reached in the Irgens litigation was reasonable; or that Kaydon's attorneys' fees in the Irgens litigation were reasonable. Therefore, Kaydon contends that it is entitled to summary judgment in its favor on its indemnity claim.

In their response to Kaydon's cross-motion for summary judgment, the Mefferd Defendants reiterate that Paragraph 12.2 of the Asset Purchase Agreement does not impose upon the Mefferd Defendants any obligation "to defend," but only an obligation "to indemnify and hold harmless." Similarly, they point out that Paragraph 12.4 merely gives the indemnitor the *right* to assume the indemnitee's defense, but does not *compel* the indemnitor to do so. The Mefferd Defendants contend that these provisions are unambiguous and plainly establish that there is no basis for Kaydon's position that the Mefferd Defendants breached the parties' contract by refusing "to defend" Kaydon. They also contend that any claim by Kaydon for indemnity did not accrue until Kaydon's liability in the Irgens litigation was fixed by judgment or settlement. In other words, they contend that Kaydon could not have filed the present indemnity claim dur-

ing the pendency of the Irgens litigation, and thus there was no breach by the Mefferd Defendants of an obligation to indemnify prior to Kaydon's failure to obtain the Mefferd Defendants' written consent to settlement. Finally, the Mefferd Defendants contend that no grounds exist for the court to abandon the strict interpretation and construction of the unambiguous indemnity provisions of the parties' contract.

In its reply in support of its cross-motion for summary judgment, Kaydon argues that the issues on the cross-motions for summary judgment boil down to one question: Can the Mefferd Defendants avoid their obligation to indemnify Kaydon for a concededly reasonable settlement by withholding their consent to that settlement, when the Mefferd Defendants had already refused to defend or indemnify Kaydon? Because Kaydon argues that the answer to this question is "clearly no," Kaydon contends that it is entitled to summary judgment. More specifically, Kaydon reiterates its contention that the Mefferd Defendants' breach of their duties to Kaydon discharged any duty Kaydon might have had to obtain the Mefferd Defendants' written consent before settling with the Irgens plaintiffs. However, this argument appears to have shifted from an argument based on the Mefferd Defendants' purported breach of a duty "to defend" to an assertion that the Mefferd Defendants anticipatorily repudiated future indemnity obligations and failed to honor their on-going obligations to pay Kaydon's attorneys' fees and costs. Kaydon also makes admittedly new arguments that the Mefferd Defendants' "written consent" argument, if valid at all, would only apply to the $350,000 settlement with the Irgens plaintiffs, not to Kaydon's claims for attorneys' fees and costs, and that the Mefferd Defendants' interpretation of the Asset Purchase Agreement is so unreasonable, and leads to such an absurd result,

that it cannot be correct. Kaydon concedes that it did not raise the last two arguments (its argument concerning the viability of a claim for attorneys' fees and costs notwithstanding failure to obtain written consent to settlement and its "absurd result" argument) in its motion for summary judgment, so that Kaydon would have no objection to additional briefing by the Mefferd Defendants on those "purely legal points." Finally, Kaydon argues that the Asset Purchase Agreement, in its entirety, was negotiated between the parties, so that the indemnity provisions cannot be construed against Kaydon; indeed, Kaydon points out that the Asset Purchase Agreement itself includes an express provision stating that the Agreement should not be construed in favor of either party.

Notwithstanding Kaydon's concession that the Mefferd Defendants might be entitled to the opportunity to brief new arguments raised in Kaydon's reply, the Mefferd Defendants indicated at oral arguments that they were content to stand on the written arguments already presented, as amplified during oral arguments.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

The disposition of a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ordinarily depends upon whether or not there are genuine issues of material fact for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996) (on a motion for summary judgment, the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). In reviewing the record, the court must view all of the facts in the light most favorable to the nonmoving party and give that par-

ty the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Quick,* 90 F.3d at 1377 (same). Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel v. Norman,* 953 F.2d 394, 395 (8th Cir.1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston v. NME Hosps., Inc.,* 133 F.3d 1104, 1107 (8th Cir.1998); *Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). When the moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.,* 122 F.3d 559, 562 (8th Cir.1997), *cert. denied,* 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach v. Sears,* 49 F.3d 1324, 1325 (8th Cir.1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel,* 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co.,* 475 U.S. at 586–87, 106 S.Ct. 1348). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *i.e.,* are "material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997).

On the other hand, a case in which the issues involved are primarily questions of law "is particularly appropriate for summary judgment," because such a case does not depend upon the presence or absence of factual disputes. *TeamBank, N.A. v. McClure,* 279 F.3d 614, 617 (8th Cir.2002) (citing *Adams v. Boy Scouts of America–Chickasaw Council,* 271 F.3d 769, 775 (8th Cir.2001)); *Bank of Am. Nat'l Trust & Sav. Ass'n v. Shirley,* 96 F.3d 1108, 1111 (8th Cir.1996) ("Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate."); *Aucutt v. Six Flags Over Mid–America, Inc.,* 85 F.3d 1311, 1315 (8th Cir.1996) (same). Liability for indemnity may be one of those questions that "is particularly appropriate for summary judgment," because the Iowa Supreme Court has explained that "[t]he question of whether [a party is] liable for indemnity is a matter for the court to determine as a matter of law." *Martin & Pitz v. Hudson Constr. Servs., Inc.,* 602 N.W.2d 805, 808 (Iowa 1999).

### B. Principles Of Iowa Indemnity Law

The parties appear to agree that the disposition of the cross-motions for summary judgment in this case depends, at least in part, and perhaps entirely, upon interpretation and construction of the indemnity provisions of the Asset Purchase Agreement, and that Iowa law controls on those issues. This court recently set forth the principles of Iowa indemnity law in *Cochran v. Gehrke, Inc.,* 293 F.Supp.2d 986 (N.D.Iowa 2003), as follows:

As the Iowa Supreme Court recently explained, " '[i]ndemnification is a form

of restitution,' " which can be "implied by law in tort claims" or "based on contract." *McNally & Nimergood v. Neumann–Kiewit Constructors, Inc.*, 648 N.W.2d 564, 570 (Iowa 2002); *McComas–Lacina Constr. Co. v. Able Constructors*, 641 N.W.2d 841, 844 (Iowa 2002) ("There are several different grounds upon which a claimant may seek indemnity, including express contract."). " '[C]ontractual indemnity is not disfavored and ordinarily will be enforced between the parties according to its terms.' " *McComas–Lacina Constr. Co.*, 641 N.W.2d at 844 (quoting *Pirelli–Armstrong Tire Corp. v. Midwest Werner & Pfleiderer, Inc.*, 540 N.W.2d 647, 649 (Iowa 1995)).

The Iowa Supreme Court has explained contractual indemnity as follows:

> Under a contract for indemnification, "one party (the *indemnitor*) promises to hold another party (the *indemnitee*) harmless for loss or damage of some kind...." II E. Allan Farnsworth, *Farnsworth on Contracts* § 6.3, at 108 (2d ed.1998). The indemnitor "promises to indemnify ... [the] indemnitee against liability of [the] indemnitee to a third person, or against loss resulting from [the] liability." 42 C.J.S. *Indemnity* § 2, at 72 (1991). Generally, no particular language is required to support indemnification, and a written agreement can be established without specifically expressing the obligation as indemnification. *See Jenckes v. Rice*, 119 Iowa 451, 452–53, 93 N.W. 384, 385 (1903); *see also Royal Ins. Co. of Am. v. Whitaker Contracting Corp.*, 242 F.3d 1035, 1041 (11th Cir.2001) (particular language not required as long as intent is clear). An indemnification agreement is created when the words used express an intention by one party to reimburse or hold the other party harmless for any loss, damage, or

liability. Robert L. Meyers III & Debra A. Perelman, Symposium, *Risk Allocation Through Indemnity Obligations in Construction Contracts*, 40 S.C. L.Rev. 989, 990 (1989) [hereinafter Meyers & Perelman]. Intent is the controlling consideration. *See Bunce v. Skyline Harvestore Sys., Inc.*, 348 N.W.2d 248, 250 (Iowa 1984); Meyers & Perelman, 40 S.C. L.Rev. at 989. Indemnification is commonly utilized in construction contracts and rental agreements, as well as many other relationships where one party engages in an act at the request of the other or for the benefit of the other, or allows a party to use property belonging to the other. *See* Meyers & Perelman, 40 S.C. L.Rev. at 990–91; 42 C.J.S. *Indemnity* §§ 1, 2, at 72.

*McNally & Nimergood*, 648 N.W.2d at 570–71.

A contract for indemnification is generally subject to the same rules of formation, validity, and construction as other contracts. *See id.* at 571; *Martin & Pitz Assocs., Inc. v. Hudson Constr. Servs., Inc.*, 602 N.W.2d 805, 808 (Iowa 1999). As to the court's task of interpreting and construing an indemnity provision, the Iowa Supreme Court has explained that the issue should be framed in terms of resolution of two separate questions: " '(1) for whose negligent acts causing damage is indemnity promised? and (2) what is the scope of the area in which indemnity is available?' " *Modern Piping, Inc. v. Blackhawk Automatic Sprinklers, Inc.*, 581 N.W.2d 616, 624 (Iowa 1998) (quoting *R.E.M. IV, Inc. v. Robert F. Ackermann & Assocs., Inc.*, 313 N.W.2d 431, 433 (Minn.1981)).

*Cochran*, 293 F.Supp.2d at 993–94.

■ In *Cochran*, this court also explained the differing roles of the court and

the jury in resolving a contractual indemnity claim, where "'[t]he question of whether [a party is] liable for indemnity is a matter for the court to determine as a matter of law.'" *Id.* at 995 (quoting *Martin & Pitz*, 602 N.W.2d at 808).

[N]ot long ago, in *Modern Piping, Inc. v. Blackhawk Automatic Sprinklers, Inc.*, 581 N.W.2d 616 (Iowa 1998), the Iowa Supreme Court explained in some detail the respective roles of the court and the jury in determination of indemnity issues.... Thus, *Modern Piping* may provide particular insight on what questions can properly be decided as a matter of law on a motion for ... summary judgment ..., and which may be subject to genuine issues of material fact precluding summary judgment on [the indemnitee's] indemnity claim.

In *Modern Piping*, as in other cases cited above, the Iowa Supreme Court first explained that courts "review the indemnity provisions of [a] contract in accordance with the same principles [courts] utilize in reviewing other contracts." *Modern Piping, Inc.*, 581 N.W.2d at 623; *see also Campbell v. Mid–America Constr. Co. of Iowa*, 567 N.W.2d 667, 669 (Iowa Ct.App.1997) ("We begin with the principle that indemnity agreements are held to the same standards of construction as other contracts."). Moreover, "[r]eview of a contract typically involves both interpretation and construction," where "[i]nterpretation of a contract requires a court to determine the meaning of contractual words," *id.*, and "construction" is the "legal effect of a contract." *Campbell*, 567 N.W.2d at 669. Iowa courts have recognized that construction is "always a matter of law to be decided by the court." *See, e.g., Campbell*, 567 N.W.2d at 669–70. Similarly, the court in *Modern Piping* explained that "[i]nterpretation is reviewed by the court as a legal issue unless it is dependent on extrinsic evidence." *Modern Piping, Inc.*, 581 N.W.2d at 623; *accord Campbell*, 567 N.W.2d at 669–70 ("interpretation" or "meaning of contractual words" is "always a matter of law to be decided by the court ... unless it depends on extrinsic evidence or a choice among reasonable inferences from extrinsic evidence"). Where there is no extrinsic evidence to consider on the meaning of the contractual language, however, the Iowa Supreme Court explained in *Modern Piping* that "the issue of the contract's interpretation should ... remai[n] with the court as well." *Modern Piping, Inc.*, 581 N.W.2d at 623. Thus,

At most, the district court should ... submi[t] special interrogatories on any relevant issues of fact. The court could then ... utiliz[e] the jury's findings to determine whether [the party claiming indemnity] had a right to indemnity. It [i]s for the district court to determine the legal effect of the indemnity clause based on factual findings of the jury, if necessary to that determination, and to ultimately determine whether [the party claiming indemnity] [i]s entitled to indemnity from [the alleged indemnitor]. It [i]s error for the district court to submit those issues to the jury....

*Modern Piping, Inc.*, 581 N.W.2d at 623–24 (internal citation omitted).

*Cochran*, 293 F.Supp.2d at 996. With these principles in mind, the court turns to disposition of the parties' cross-motions for summary judgment on Kaydon's indemnity claim.

### C. Kaydon's Indemnity Claim

### 1. Applicability of the indemnity provisions to the Irgens litigation

There can be no doubt in this case as to the answer to the first question posed by the Iowa Supreme Court for interpretation

and construction of an indemnity provision, for whose acts causing damage is indemnity promised? *Cochran*, 293 F.Supp.2d at 993–94 (citing *Modern Piping, Inc.*, 581 N.W.2d at 624, in turn quoting *R.E.M. IV, Inc.*, 313 N.W.2d at 433). Paragraph 12.2 of the Asset Purchase Agreement unambiguously provides that *the Mefferd Defendants* will indemnify *Kaydon* for certain specified claims, including claims based on the Mefferd Defendants' manufacture of hydraulic cylinders prior to Kaydon's purchase of the Mefferd Defendants' assets. Defendants' Appendix at 29. Thus, the Agreement clearly and unambiguously provides that the Mefferd Defendants will indemnify Kaydon for certain conduct by the Mefferd Defendants.

The answer is less clear as to the second question, what is the scope of the area in which indemnity is available? *Cochran*, 293 F.Supp.2d at 993–94. Among the claims specifically listed in Paragraph 12.2 of the Asset Purchase Agreement is "any product liability claim or other claim for the breach of any express or implied warranty, and any other claim of whatever nature, and from all damages resulting therefrom, which may be made in connection with the sale of products manufactured by Seller prior to the Closing Date[.]" Defendants' Appendix at 29 (¶ 12.2(a)(iii)). The parties do not dispute that the Irgens plaintiffs' claims in the California litigation, arising from the alleged malfunction of a cherry picker, which utilized a hydraulic cylinder manufactured by the Mefferd Defendants prior to March 11, 1997, the "Closing Date" for the Asset Purchase Agreement, were claims *of the type* identified in this indemnity provision of the Asset Purchase Agreement. What they do dispute, as to the scope of the area in which indemnity is available, is what the Mefferd Defendants were required to do in response to such a claim.

## 2. What were the Mefferd Defendants required to do?

### a. Was there a duty "to defend"?

■ As a matter of interpretation, *i.e.*, determination of the meaning of the contractual words, *see Cochran*, 293 F.Supp.2d at 996, Paragraph 12.2 of the contract expressly, and unambiguously, states that the Mefferd Defendants "shall, jointly and severally, *indemnify and hold* [Kaydon] *harmless* from and against any and all claims" of the type brought by the Irgens plaintiffs. Defendants' Appendix at 29 (emphasis added). The word "defend" does not appear in this provision. Thus, as a matter of construction, *i.e.*, the legal effect of the language used, *see Cochran*, 293 F.Supp.2d at 996, there was no express legal obligation for the Mefferd Defendants "to defend" Kaydon. To the contrary, Paragraph 12.4(a) provides that, after receiving notice of a claim of the type for which they might be obligated to indemnify Kaydon, the Mefferd Defendants, as indemnitors, "*shall have the right to assume entire control of [their] defense* (including the selection of counsel), subject to the right of the Indemnitee to participate (with counsel of its choice) in, the defense, compromise or settlement thereof." *Id.* at 30 (emphasis added). A *right* to assume the entire control of the indemnitor's defense is plainly not the same as— and necessarily excludes—an *obligation* to assume the indemnitee's defense.

■ Nevertheless, Kaydon appeared to argue, at least initially, that an obligation "to indemnify" necessarily includes an obligation "to defend," for example, by citing authorities holding that a party who refuses to defend another leaves the other party free to settle with the injured party without losing a right to recover from the first party. *See Kelly v. Iowa Mut. Ins. Co.*, 620 N.W.2d 637, 641–42 (Iowa 2000); 44 Am.Jur.2d, *Insurance*, § 1420 at p. 367

(1982); *Jones v. Southern Surety Co.*, 210 Iowa 61, 230 N.W. 381, 385 (1929). However, in the scenario addressed by each of these authorities, what was at issue was *an insurer's* undisputed obligation to defend an *insured*. *See Kelly*, 620 N.W.2d at 640–41 (there was no dispute that an insurer had an obligation to defend an insured); 44 Am.Jur.2d, *Insurance*, § 1420 (also involving an insurer under a duty to defend an insured); *Jones*, 230 N.W. at 383 (the policy provided that the insurer "will at its own cost defend the assured in all actions or proceedings founded on a claim of title or encumbrance prior in date to this bond and not excepted therein"). The court has found no Iowa or other authorities holding that a duty "to indemnify and hold harmless" necessarily imposes or implies a duty "to defend." Even assuming that an insurance policy is analogous to an indemnity agreement in all pertinent respects—a premise that the court by no means accepts as true—courts have recognized that an insurer's duty to defend an insured is necessarily broader than its duty to indemnify its insured, because of the difficulty of determining whether a third party's suit falls within the scope of indemnification coverage before that suit is resolved. *See, e.g., Pension Trust Fund for Operating Eng'rs v. Federal Ins. Co.*, 307 F.3d 944, 949 (9th Cir.2002). Therefore, the duty "to indemnify" does not expressly or impliedly include a duty "to defend."

The court, therefore, concludes that, as a matter of law, the Mefferd Defendants were under no contractual duty "to defend" Kaydon in the Irgens litigation.

### b. Was there an "on-going duty" to pay attorneys' fees and costs?

■ Perhaps because of Kaydon's inability to identify any authority holding that a duty "to indemnify" includes a duty "to defend," Kaydon shifts its ground in its reply brief, and asserts that the Mefferd Defendants had, but breached, an "on-going duty" to pay Kaydon's attorneys' fees and costs in defending in the Irgens litigation.[2] In its briefing of the cross-motions for summary judgment, Kaydon again failed to cite any provision of the Asset Purchase Agreement expressly stating such an obligation. However, in the course of the oral arguments, Kaydon suggested, for the first time, that the "hold harmless" language required the ongoing payment of attorneys' fees and costs. Kaydon did not explain how an ongoing obligation to pay attorneys' fees and costs arises from the duty "to indemnify" or a duty "to hold harmless," any more than Kaydon was able to explain how a duty "to defend" arises from a duty "to indemnify and hold harmless," and cited no authority holding that a duty "to indemnify" or "to hold harmless" necessarily implies an "on-going duty" to pay attorneys' fees and costs. Indeed, this court

---

2. Indeed, in its Reply, Kaydon asserts that the Mefferd Defendants' argument that they did not have a duty "to defend" Kaydon, only a duty "to indemnify" Kaydon was "not really at issue," without explanation. *See* Kaydon's Reply Brief at 3. Such a characterization of the issues in the case is disingenuous, at best, where Kaydon persistently asserted during the Irgens litigation that the Mefferd Defendants had a duty "to defend" Kaydon; persistently asserted in this litigation, at least up until the filing of its reply brief, that the Mefferd Defendants breached the indemnity

agreement by refusing "to defend" Kaydon; and the Mefferd Defendants asserted, in response to Kaydon's motion for summary judgment, that they had no such duty "to defend" under the Asset Purchase Agreement. Indeed, Kaydon's statement in its Reply that "[w]hile the Mefferds may not have had a duty to defend Kaydon, they certainly had a duty to indemnify it," *see id.*, can be read as all but admitting that Kaydon cannot support its contention that the Mefferd Defendants had a duty "to defend" under the Asset Purchase Agreement.

has been unable to find any authority distinguishing between an obligation "to indemnify" and an obligation "to hold harmless." *See, e.g., Associated Eng'rs, Inc. v. Job,* 370 F.2d 633, 651 (8th Cir.1966) (applying South Dakota law and concluding that "[a] construction which would not permit indemnity would render the hold harmless clause without meaning or significance"); *see also Cochran,* 293 F.Supp.2d at 994 (" 'Generally, no particular language is required to support indemnification, and a written agreement can be established without specifically expressing the obligation as indemnification. An indemnification agreement is created when the words used express an intention by one party to reimburse or hold the other party harmless for any loss, damage, or liability.' ") (quoting *McNally & Nimergood,* 648 N.W.2d at 570–71, with internal citations omitted). Moreover, while Paragraph 12.4(a) of the Asset Purchase Agreement provides that the Mefferd Defendants have the *right,* but not the *obligation,* to assume Kaydon's defense to a claim upon notice of a demand for indemnification, and Paragraph 12.2 provides that the Mefferd Defendants must ultimately "indemnify and hold [Kaydon] harmless," including for attorneys' fees and costs, if otherwise required to indemnify under the terms of the Agreement, the Agreement is silent on when Kaydon is entitled to receive such indemnification from, or to be held harmless by, the Mefferd Defendants.

In response to Kaydon's argument that the Mefferd Defendants had some "ongoing duty" to pay Kaydon's attorneys' fees and costs, the Mefferd Defendants assert that a claim for indemnification is not "automatic" and is not an unqualified promise to pay the indemnitor, citing *Vermeer v. Sneller,* 190 N.W.2d 389, 392 (Iowa 1971), and, moreover, that an indemnity claim does not accrue until the indemnitee's liability is fixed by judgment or set-tlement, citing *Evjen v. Brooks,* 372 N.W.2d 494, 496 (Iowa 1985); *Becker v. Central States Health and Life Co.,* 431 N.W.2d 354, 357 (Iowa 1988); and *Israel v. Farmers Mut. Ins. Ass'n,* 339 N.W.2d 143, 146 (Iowa 1983). In reply, Kaydon argues that it had suffered "actual loss," and thus, some amount of liability became certain, as soon as the Mefferd Defendants failed to pay some of Kaydon's attorneys' fees and costs in the Irgens litigation. Kaydon also asserts that this is "not the typical indemnity case," because there was no dispute that the hydraulic cylinder at the center of the Irgens litigation was manufactured by the Mefferd Defendants before Kaydon acquired the Mefferd Defendants' assets, so that there was no question that the Mefferd Defendants would ultimately be liable for Kaydon's attorneys' fees and costs in the Irgens litigation.

■ The Mefferd Defendants are correct that, under Iowa law, "an action for indemnity or contribution accrues or becomes enforceable only when the indemnitee's legal liability becomes fixed or certain as in the entry of judgment or a settlement." *Evjen v. Brooks,* 372 N.W.2d 494, 496 (Iowa 1985) (citing *Vermeer v. Sneller,* 190 N.W.2d 389, 392 (Iowa 1971); *Archibald v. Midwest Paper Stock Co.,* 176 N.W.2d 761, 763–64 (Iowa 1970); *Kroblin Transfer, et al. v. Birmingham Fire Insurance Co.,* 239 Iowa 15, 18, 30 N.W.2d 325, 327 (1948); *Duke v. Tyler,* 209 Iowa 1345, 1349, 230 N.W. 319, 320–21 (1930); *Samuelson v. Chicago, R.I. & Pac. R.R.,* 287 Minn. 264, 268, 178 N.W.2d 620, 624 (1970); Furnish, *Distributing Tort Liability: Contribution and Indemnity in Iowa,* 52 Iowa L. Rev. 31, 53 (1966); 42 C.J.S. *Indemnity* § 21, at 596 (1944) ("an implied contract of indemnity arises in favor of a person who without fault on his part is exposed to liability and compelled to pay damages on account of the negligence or

tortious act of another....")); *see also McNally & Nimergood v. Neumann–Kiewit Constructors, Inc.*, 648 N.W.2d 564, 575–76 (Iowa 2002) ("Normally, a judgment in the underlying action will establish the essential liability to pursue indemnification."). Contrary to Kaydon's arguments, the statement in *Becker v. Central States Health and Life Co. of Omaha*, 431 N.W.2d 354 (Iowa 1988), that, "[i]n an agreement to indemnify, a cause of action does not accrue unless and until some actual loss or damage has been suffered," *see Becker*, 431 N.W.2d at 357, does not require "on-going" payment of attorneys' fees and costs. Read in light of *Evjen*, and authorities cited therein, it is clear that the "actual loss or damage" identified in *Becker* is not simply incurring costs to defend against a claim to which indemnity may apply, but the "actual loss or damage" of *paying a claim* for which the payor is entitled to indemnity from another. *See, e.g., Evjen*, 372 N.W.2d at 496 ("[A]n action for indemnity or contribution accrues or becomes enforceable *only when the indemnitee's legal liability becomes fixed or certain as in the entry of judgment or a settlement.*") (emphasis added); 42 C.J.S. *Indemnity* § 21, at 596 (1944) ("[A]n implied contract of indemnity arises in favor of a person who without fault on his part *is exposed to liability and compelled to pay damages* on account of the negligence or tortious act of another....") (emphasis added).

■■ Indeed, it appears to the court that one of the flaws in Kaydon's summary judgment motion and resistance to the Mefferd Defendants' summary judgment motion is Kaydon's persistent argument that the Mefferd Defendants' obligations under the indemnity provisions of the Asset Purchase Agreement are similar or identical to the obligations of an insurer under an insurance policy. This argument, however, demonstrates that Kaydon has not understood the distinction between an "agreement to indemnify"—where "a cause of action does not accrue unless and until some actual loss or damage has been suffered"—and "a promise to pay"—where "an action for breach of contract accrues when the time for doing such an act or making such payment has occurred and the promisor has failed to perform." *See Becker*, 431 N.W.2d at 357. What is at issue in this case is "an agreement to indemnify," not "a promise to pay." *See id.; see also Vermeer*, 190 N.W.2d at 392 ("Generally, the right to indemnification is not automatic and is not an unqualified promise to pay by the indemnitor."). Even if it was "certain" under the facts of this case that the Mefferd Defendants would ultimately be subject to a claim for indemnity for attorneys' fees and costs, that "certainty" is not the same as "the indemnitee's legal liability becom[ing] fixed or certain [by] the entry of judgment or a settlement." *Evjen*, 372 N.W.2d at 496. Neither the language of the Asset Purchase Agreement nor the controlling law warrants Kaydon's conclusion that its claim for indemnity for attorneys' fees and costs accrued dollar-by-dollar as those fees and costs were incurred.

■■ Moreover, to establish a contractual right to indemnity, where the purported indemnitee has *settled* a claim, as is the case here, "an indemnitee ... must establish the existence of its liability to the injured party as an element of recovery for indemnification." *McNally & Nimergood*, 648 N.W.2d at 576 (noting that, in addition, "the indemnitee must establish the settlement was reasonable, and that the indemnitor had a duty to indemnify the indemnitee"). In other words, as the Mefferd Defendants argue, indemnity is not "automatic," *see Vermeer*, 190 N.W.2d at 392 ("Generally, the right to indemnification is not automatic and is not an unqualified promise to pay by the indemnitor."), and "a settlement does not constitute an adju-

dication of the issues of negligence with the injured party and does not, by itself, bar further adjudication on the merits of a claim against another party." *McNally & Nimergood*, 648 N.W.2d at 575. Thus, the Mefferd Defendants had no obligation to pay anything to Kaydon while the Irgens litigation was pending, and even after that litigation was settled, the Mefferd Defendants were still entitled to put Kaydon to the proof on Kaydon's claim of indemnity. *See id.*

Thus, as a matter of law, the Mefferd Defendants were not under any "on-going obligation" to pay Kaydon's attorneys' fees or costs in the Irgens litigation.

### 3. Anticipatory repudiation

In its reply in further support of its motion for summary judgment, Kaydon contends, for the first time, that the Mefferd Defendants "anticipatorily repudiated" their future indemnity obligations by (1) denying that indemnity for the Irgens plaintiffs' claims was appropriate, where the Mefferd Defendants asserted that Kaydon was plainly the "wrong party" on the Irgens plaintiffs' claims; (2) by asserting that they *could not* pay any indemnity claim, because of their dire financial condition; and (3) by failing to honor their on-going obligations to pay Kaydon's attorneys' fees and costs. Kaydon cites *Conrad Brothers. v. John Deere Ins. Co.*, 640 N.W.2d 231, 241–42 (Iowa 2001), in support of these contentions.

■ As Kaydon points out, in *Conrad Brothers*, the Iowa Supreme Court explained the effects of repudiation as follows:

Where one party to a contract repudiates the contract before the time for performance has arrived, the other party is relieved from its performance. *See* Restatement (Second) of Contracts § 253(2) (1981); 13 Richard A. Lord, *Williston on Contracts* § 39:37, at 663

(4th ed.2000) [hereinafter *Williston*]. Additionally, once a party repudiates a contractual duty before performance is due, the other party may enforce the obligation by filing a claim for damages without fulfilling any conditions precedent. Restatement (Second) of Contracts § 253 cmt. b; 13 *Williston* § 39:37, at 666, 668. A repudiation of a contract is accorded the same effect as a breach by nonperformance. Restatement (Second) of Contracts § 255 cmt. a.

*Conrad Brothers*, 640 N.W.2d at 241. Therefore, Kaydon is correct that, if the Mefferd Defendants repudiated the indemnity agreement before Kaydon was required to seek the Mefferd Defendants' written consent to Kaydon's settlement with the Irgens plaintiffs, then Kaydon was relieved of the condition precedent of obtaining the Mefferd Defendants' written consent to the settlement, and is still entitled to enforce the indemnity obligation through a claim for damages. *Id.* However, *Conrad Brothers* does not require summary judgment in Kaydon's favor, as can be seen when each of the ways that Kaydon insists that the Mefferd Defendants "anticipatorily repudiated" the indemnity agreement is considered in turn.

#### a. Repudiation based on "on-going duties"

■ The analysis above, regarding the lack of any basis for a supposed "on-going duty" on the Mefferd Defendants' part to pay Kaydon's attorneys' fees and costs in the Irgens litigation, as well as the lack of any basis for a supposed duty "to defend" Kaydon, also disposes of at least part of Kaydon's "anticipatory repudiation" argument. Plainly, where the Mefferd Defendants were under no "on-going duty" to pay Kaydon's attorneys' fees and costs or to defend Kaydon, the Mefferd Defendants' refusal to do so was *not* an anticipatory repudiation of the indemnity provi-

sions of the Asset Purchase Agreement. Indeed, in this case, the party making demands for performance on terms that went beyond the parties' contract was *Kaydon*, not the Mefferd Defendants, where Kaydon demanded, during the Irgens litigation, that the Mefferd Defendants provide an immediate defense or on-going payment of attorneys' fees and costs to which Kaydon was not entitled under the Asset Purchase Agreement. *Cf. id.* at 242 (a demand for performance on terms that go beyond the contract may constitute repudiation, if coupled with an intent not to perform unless those terms are accepted). Therefore, the Mefferd Defendants' refusal to provide a defense or to pay Kaydon's "on-going" attorneys' fees or costs or to assume Kaydon's defense in the Irgens litigation did not amount to repudiation of the indemnity agreement as a matter of law.

### b. Repudiation based on assertion that Kaydon was the "wrong party"

■ In support of its companion contention that the Mefferd Defendants anticipatorily repudiated the indemnity agreement by asserting that indemnity was inappropriate, where the Mefferd Defendants asserted that Kaydon was the "wrong party" to the Irgens litigation, Kaydon again likens this case to the *Conrad Brothers* case. This time, Kaydon cites *Conrad Brothers* for the proposition that an insurer's denial of coverage amounted to repudiation.

Whatever the merits of this portion of the *Conrad Brothers* decision, in the context of an insurer's duty to an insured—*i.e.*, in the context of a contract involving a "promise to pay" rather than an agreement to indemnify—it does not apply, by analogy, to a case involving *an indemnity agreement* between two entities regarding a third party's products liability claim: An indemnitor's assertion that a third party's claim is not one that would subject the indemnitor to indemnity is simply not analogous to denial of coverage for an insured's claim. *See Vermeer*, 190 N.W.2d at 392 ("Generally, the right to indemnification is not automatic and is not an unqualified promise to pay by the indemnitor."). Moreover, as the *Conrad Brothers* decision states, "[W]hen two parties differ as to the interpretation of a contract, the mere demand by one party that the contract be performed according to its interpretation does not in and of itself constitute repudiation. Instead, a demand must be accompanied by a clear expression of intent not to perform under any other interpretation." *Conrad Bros.*, 640 N.W.2d at 241–42. Here, Kaydon has done no more than point to evidence that the Mefferd Defendants disputed whether the Asset Purchase Agreement required them to indemnify Kaydon for the Irgens plaintiffs' claims—a question that, as explained above, was not ripe until Kaydon's liability on the Irgens plaintiffs' claims was determined by judgment or settlement, and still open to contest even after settlement. Kaydon has not pointed to other evidence demonstrating "a clear expression [by the Mefferd Defendants] of intent not to perform under any other interpretation." *See id.*

Therefore, the Mefferd Defendants' assertion that Kaydon was the "wrong party" on the Irgens plaintiffs' claim does not establish that the Mefferd Defendants repudiated the indemnity agreement with Kaydon as a matter of law, because this evidence simply does not provide any inference of a "clear expression of intent not to perform under any other interpretation." *See id.*

### c. Repudiation based on a statement of inability to perform

■ Finally, Kaydon asserts that the Mefferd Defendants repudiated the indemnity agreement by asserting that they

*could not* pay indemnity for any claim against Kaydon, owing to their precarious financial condition, again citing *Conrad Brothers,* 640 N.W.2d at 241. Kaydon asserts that, by the time the settlements were reached, the Mefferd Defendants had made it abundantly clear that they were "broke" and could not pay anybody's attorneys' fees, including their own. In *Conrad Brothers,* the Iowa Supreme Court explained that, among other things, " 'repudiation consists of a statement that the repudiating party cannot ... perform,' " and that " '[t]he statement must be sufficiently positive to be reasonably understood ... that the breach will actually occur.' " *Id.* at 241 (quoting II E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 8.21 at 535 (2d ed.1998)). However, this principle does not necessarily require summary judgment in Kaydon's favor, either.

As to the record evidence in support of its contention that the Mefferd Defendants repudiated the indemnity agreement by stating that they could not perform, Kaydon relies on a declaration of its own attorney in the Irgens litigation to the effect that "[t]he Mefferds refused to attend [a settlement conference], claiming financial hardship (although attorney Charles R. Grebing attended on their behalf and on behalf of their business entities)"; that "the Mefferds and their entities settled with [the Irgens] Plaintiffs for $15,000, again claiming financial hardship," Kaydon's Appendix at 24–25; and that the Mefferd Defendants "were taking a cavalier position in this case, primarily because they had no insurance, ostensibly no money, they lived in either Iowa or Texas, and they thought they 'knew' there was nothing wrong with the cylinder," so that "they could gamble on this case because they knew Kaydon would be responsible for any jury verdict as the successor corporation

to Gold Star Manufacturing" and would, therefore, be the Mefferds' "insurance policy." *Id.* at 27. Kaydon also relies on a declaration of the attorney representing the Mefferds in the Irgens litigation in support of the Mefferd Defendants' application for a determination of good faith settlement, in which counsel represented that the $15,000 paid by the Mefferds was fair and reasonable, in light of the parties' arguments concerning the value of the claim, the financial condition of the defendants (including their lack of insurance), and "all of the factors relative to liability, exposure, incurred attorneys' fees, costs and expenses, and their strong belief and feeling that they share no liability with respect to any of the claims presented by the [Irgens] plaintiffs in this matter." *Id.* at 75. Finally, Kaydon relies on Lloyd Mefferd's declaration, also in support of a determination of good faith settlement, that "[a]t present, neither Floyd Mefferd, ACI, nor myself have sufficient funds to pay our attorney's fees" and "[i]f adverse judgment is rendered against Floyd Mefferd, ACI, or myself, we will be forced to declare bankruptcy." *Id.* at 88.

However, the portions of the record relied upon by Kaydon do not establish beyond dispute that there was any statement by or on behalf of the Mefferd Defendants that they *could not pay indemnity,* even though the cited portions of the record may make clear that the Mefferd Defendants relied in part on their purported financial hardship as grounds for offering only a relatively small sum to settle the Irgens plaintiffs' claims. These portions of the record indicate that the Mefferd Defendants *also* disputed their liability for the Irgens plaintiffs' claims; financial hardship was not their sole basis for offering a relatively small sum to settle the Irgens plaintiffs' claims against them.[3]

---

3. The record elsewhere indicates that the Mefferd Defendants contended that the hy-

draulic cylinder that they manufactured either had not failed or had been altered by

Moreover, a statement that a party does not currently have sufficient "funds" to pay attorneys' fees does not necessarily indicate that a party has no other *assets* from which to satisfy a judgment or a claim for indemnity, even assuming that the statement has anything at all to do with the Mefferd Defendants' potential indemnity to Kaydon. Finally, a statement that a party will be forced into bankruptcy by an *adverse judgment* does not establish beyond dispute that the Mefferd Defendants *could not pay indemnity for a settlement*, where Kaydon itself suggested that the Irgens plaintiffs' claims might reasonably have resulted in a judgment in the millions of dollars, but Kaydon ultimately settled the Irgens plaintiffs' claims against it for $350,000. In other words, genuine issues of material fact prevent summary judgment in Kaydon's favor on its claim that the Mefferd Defendants repudiated the indemnity agreement.

### 4. Kaydon's failure to obtain consent to settlement

Because the court has determined that Kaydon is not entitled to summary judgment on its indemnity claim on the ground that the Mefferd Defendants first breached the indemnity agreement, the focus now shifts to the Mefferd Defendants' contention that they are entitled to summary judgment in their favor on Kaydon's indemnity claim, because Kaydon failed to obtain their written consent to settle the Irgens litigation, as required by the indemnity agreement. The Mefferd Defendants contend that the indemnity provisions of the Asset Purchase Agreement required Kaydon to obtain their written consent to any settlement, or the Mefferd Defendants would not be liable for that settlement. They contend, further, that

some other person, causing it to fail, and even Kaydon's evidence, cited above, demonstrates that Kaydon was aware of the Mefferd Defen-

such "written consent" provisions are enforceable under Iowa law, which Kaydon does not dispute, and that there is no genuine issue of material fact that Kaydon never obtained their written consent to settlement, which Kaydon also does not dispute. However, Kaydon contends that, for various reasons, the "written consent" provision nevertheless does not excuse the Mefferd Defendants from liability for indemnity for Kaydon's settlement of the Irgens litigation or Kaydon's attorneys' fees and costs incurred in that litigation.

### a. The "written consent" clause

Again, the provision upon which the Mefferd Defendants rely provides, in pertinent part, as follows:

> The Indemnitor shall not be liable for any settlement by Indemnitee of any action, suit, proceedings, claim or demand, unless the Indemnitee obtains the prior written consent of the Indemnitor.

Defendants' Appendix at 30–31. At least when read in isolation, this provision plainly requires written consent by the indemnitor, here the Mefferd Defendants, to *any* settlement by the indemnitee, here Kaydon, before the indemnitor can be liable for the settlement. Kaydon does not challenge the enforceability of such a provision. Nor does Kaydon deny that it did not obtain the Mefferd Defendants' written consent to Kaydon's settlement with the Irgens plaintiffs. Therefore, in the absence of some other factor, the Mefferd Defendants would appear to be entitled to summary judgment that they are not liable for indemnity to Kaydon for its settlement with the Irgens plaintiffs.

dants' contention that they were not at fault for the Irgens plaintiffs' injuries.

### b. The "context" of the clause

■ Kaydon, however, contends that there are other factors precluding summary judgment in the Mefferd Defendants' favor. Kaydon argues that the "written consent" provision appears, and must be read in the context of, the paragraph of the Asset Purchase Agreement dealing with the situation in which the indemnitor has already assumed the indemnitee's defense. Therefore, Kaydon argues that the "written consent" requirement only applies in the scenario where the indemnitor has assumed the indemnitee's defense. This result, Kaydon asserts, is in accord with the Iowa rule that contracts must be interpreted as a whole, not as a collection of individual clauses.

■ Kaydon is correct that, under Iowa law, courts "do not interpret [a] contractual term apart from the context of the agreement as a whole. The parties' intent as evidenced by all of the terms of the contract controls [a court's interpretation]." *Koenigs v. Mitchell County Bd. of Supervisors*, 659 N.W.2d at 589, 594 (Iowa 2003) (internal citations omitted); *see also American Soil Processing, Inc. v. Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd.*, 586 N.W.2d 325, 334 (Iowa 1998) (because agreements are to be interpreted as a whole, an interpretation that gives meaning to all terms is preferred to one rendering a part unreasonable); *Cairns v. Grinnell Mut. Reinsurance Co.*, 398 N.W.2d 821, 825 (Iowa 1987) ("[W]e adhere to the proposition that 'a contract should be read and interpreted as an entirety rather than seriatim by clauses.'") (quoting *Archibald v. Midwest Paper Stock Co.*, 176 N.W.2d 761, 763 (Iowa 1970)). However, this rule does not carry Kaydon nearly as far as Kaydon would suggest.

Reading the "written consent" clause in context, the court concludes that the clause does *not* pertain only to an action in which the indemnitor has assumed the indemnitee's defense, as Kaydon contends. The court reaches this conclusion for two principal reasons. First, while the first clause of Paragraph 12.4(c) can be read to refer only to the circumstance in which the indemnitor has assumed the indemnitee's defense, because it is expressly cast in terms of the indemnitee's cooperation with the indemnitor "in any such defense, compromise or settlement," the remaining clauses of Paragraph 12.4(c), referring to settlement by the indemnitor or the indemnitee without the other's written consent, are cast in terms of an "action, suit, proceedings, claim or demand," not in terms of a "defense." *See* Defendants' Appendix at 31 (Asset Purchase Agreement, Paragraph 12.4(c)). Thus, the "action, suit, proceedings, claim or demand" in question must be the same "action, suit, proceedings, claim or demand" first identified in Paragraph 12.4. In other words, the language "any action, suit, proceedings, claim or demand" in the last sentence of Paragraph 12.4(c) means the same thing as comparable language in the first line of Paragraph 12.4(a), *i.e.*, "any action, suit or proceeding ... commenced, or any claim or demand ... asserted, in respect of which a party entitled to indemnification pursuant to this Agreement (the "Indemnitee") demands indemnification under this Section 12." *See* Defendants' Appendix at 30 (Asset Purchase Agreement, Paragraph 12.4(a)). Second, the "written consent" provision refers to "settlement by Indemnitee of *any* action, suit, proceedings, claim or demand," without limitation, not to "any action, suit, proceedings, claim or demand in which the Indemnitor has assumed the Indemnitee's defense." *See id.* at 31 (Asset Purchase Agreement, Paragraph 12.4(c)). Kaydon's more restrictive reading is simply too strained, and fails to give full effect to the language actually used in

the pertinent provisions, when read in context, to be accepted.

### c. *Effect of settlement without written consent*

▮ Even if the court reaches the conclusion that the "written consent" provision applies outside of the context in which the indemnitor has assumed the indemnitee's defense, Kaydon contends that the failure to obtain such written consent only excuses the indemnitor's liability *for the settlement,* but *not* for attorneys' fees and costs incurred by the indemnitee in the third-party litigation. At oral arguments, the Mefferd Defendants conceded that Kaydon's reading of the "written consent" clause was reasonable and correct in this respect, and the court now concurs.

Again, the "written consent" provision provides, "The Indemnitor *shall not be liable for any settlement* by Indemnitee of any action, suit, proceedings, claim or demand, unless the Indemnitee obtains the prior written consent of the Indemnitor." *See* Defendants' Appendix at 31 (Asset Purchase Agreement, Paragraph 12.4(c)) (emphasis added). In contrast to the preceding clause, regarding the indemnitor's failure to obtain the indemnitee's consent to settlement, this provision makes no reference to excusing or limiting the indemnitor's liability for the indemnitee's attorneys' fees and costs. *See id.* ("The Indemnitor will not compromise or settle any such action, suit, proceedings, claim or demand without the prior written consent of the Indemnitee; provided, however, that in the event such consent is withheld, then the liabilities of the Indemnitor shall be limited to the total sum representing the amount of the proposed compromise or settlement and the amount of counsel fees accumulated at the time such consent is withheld."). Thus, Kaydon's undisputed failure to obtain the Mefferd Defendants' written consent to Kaydon's settlement with the Ir-

gens plaintiffs only excuses the Mefferd Defendants from liability for Kaydon's *settlement,* but not from liability for Kaydon's *attorneys' fees and costs,* assuming for the moment that Kaydon is unable to prove that the Mefferd Defendants repudiated the indemnity agreement by stating that they could not perform before Kaydon failed to obtain the Mefferd Defendants' consent to the settlement.

▮ Kaydon is consequently entitled to summary judgment that its failure to obtain the Mefferd Defendants' written consent to settlement does not bar Kaydon's indemnity claim for its attorneys' fees and costs in the Irgens litigation. Kaydon argues, further, that the Mefferd Defendants have never disputed the reasonableness of those fees and costs, and the court agrees. However, even assuming the amount of reasonable attorneys' fees and costs is not in dispute, as explained above, the Mefferd Defendants are still entitled to put Kaydon to the proof on its entitlement to any indemnity. *See McNally & Nimergood,* 648 N.W.2d at 576 (an indemnitee who has settled a third party's claim and seeks indemnity pursuant to a contract "must establish the existence of its liability to the injured party as an element of recovery for indemnification," and also "must establish the settlement was reasonable, and that the indemnitor had a duty to indemnify the indemnitee").

### 5. *"Absurd" and "unreasonable" result*

▮ Finally, in a renewed attempt to recover the amount of its settlement with the Irgens plaintiffs, as well as its attorneys' fees and costs in the Irgens litigation, Kaydon argues that the Mefferd Defendants are asserting a construction of the indemnity agreement that permits the Mefferd Defendants to sit back, do nothing, pay nothing, refuse to consent to any

settlement Kaydon might reach with the Irgens plaintiffs, and thereby leave Kaydon with a Hobson's choice: either settle with the Irgens plaintiffs, and waive any claim for indemnification from the Mefferd Defendants, or go to trial against the Irgens plaintiffs and incur what the parties agree would have been a much larger loss, in the millions of dollars, which the Mefferd Defendants had already indicated that they could not pay. This result, Kaydon contends, is so unreasonable and absurd that it cannot be correct or enforceable.

 Kaydon is correct that, under Iowa law, " 'Because an agreement is to be interpreted as a whole, it is assumed in the first instance that no part of it is superfluous; an interpretation that gives a reasonable, lawful, and effective meaning to all of the contract's terms is preferred to an interpretation that leaves a part unreasonable, unlawful, or of no effect.' " *American Soil Processing, Inc. v. Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd.*, 586 N.W.2d 325, 334 (Iowa 1998) (quoting *Fashion Fabrics v. Retail Investors Corp.*, 266 N.W.2d 22, 26 (Iowa 1978)); *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859 863 (Iowa 1991) (same). Moreover, under Iowa law, "[c]onstruction should be . . . in accordance with the object sought to be accomplished, and should be reasonable and fair and not absurd." *Winfield State Bank v. Snell*, 208 Iowa 1086, 226 N.W. 774, 777 (Iowa 1929).[4] However, the court does not agree with Kaydon that the construction of the contract reached above necessarily leads to an "unreasonable" or "absurd" result.

First, construing the indemnity agreement as not requiring the Mefferd Defendants to assume Kaydon's defense and not requiring them to pay Kaydon's on-going attorneys' fees and costs—*i.e.*, as allowing the Mefferd Defendants to sit back, do nothing, and pay nothing, as Kaydon characterizes it—is not "absurd" or "unreasonable," because, as explained above, a claim for indemnity, unlike a claim for breach of a "promise to pay," does not accrue until "the indemnitee's legal liability becomes fixed or certain as in the entry of judgment or a settlement." *Evjen*, 372 N.W.2d at 496; *Becker*, 431 N.W.2d at 357 (distinguishing between "an agreement to indemnify" and "a promise to pay"); *Vermeer*, 190 N.W.2d at 392 ("Generally, the right to indemnification is not automatic and is not an unqualified promise to pay by the indemnitor."). Paragraph 12.4(a) of this Agreement specifically provides that the indemnitor (the Mefferd Defendants) has the right to assume the indemnitee's (Kaydon's) defense, but does not have an obligation to do so; thus, it would be absurd and unreasonable to construe the Agreement in such a way as to ignore this provision and, instead, to impose an ongoing obligation to defend and to pay attorneys' fees and costs. *American Soil*

---

**4.** The *Winfield State Bank* decision, among others, also stands for the proposition that ordinarily "construction should be most strongly against the user of the words." *Winfield State Bank*, 226 N.W. at 777. Kaydon does not dispute that it originally drafted the Asset Purchase Agreement, although Kaydon contends that the Agreement was subject to extensive negotiation. The Mefferd Defendants, on the other hand, contend that there was no negotiation concerning the indemnity provisions, so that Kaydon undisputedly was the drafter of those portions of the Agreement. The court concludes that this issue of whether or not the indemnity provisions can be construed against Kaydon is resolved by Paragraph 20 of the Asset Purchase Agreement, which expressly states, "The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party." Defendants' Appendix at 33 (Asset Purchase Agreement, Paragraph 20). Therefore, construing the Agreement against Kaydon, as the supposed drafter, is not appropriate.

*Processing, Inc.,* 586 N.W.2d at 334 (" 'Because an agreement is to be interpreted as a whole, it is assumed in the first instance that no part of it is superfluous; an interpretation that gives a reasonable, lawful, and effective meaning to all of the contract's terms is preferred to an interpretation that leaves a part unreasonable, unlawful, or of no effect.' ") (quoting *Fashion Fabrics,* 266 N.W.2d at 26). Therefore, an agreement to indemnify in general, and this Agreement to indemnify in particular, reasonably contemplates that the indemnitor may choose not to assume the indemnitee's defense or to bear the indemnitee's fees and costs until the indemnity claim accrues.

Nor is the court's construction of the indemnity agreement here "absurd" or "unreasonable" when the provisions discussed just above are coupled with a provision that requires the indemnitee to obtain the indemnitor's consent before settling with a third party—*i.e.,* a construction that allows the Mefferd Defendants to sit back, do nothing, pay nothing, and refuse to consent to any settlement Kaydon might reach with the Irgens plaintiffs, as Kaydon would have it. It certainly would have been wiser for the parties to require that the indemnitor's consent not be *unreasonably* withheld, or otherwise to protect the indemnitee from undue burdens if the indemnitor failed to give consent to a reasonable settlement. However, the clause of Paragraph 12.4(c) regarding the *indemnitor's* obligation to obtain the consent of the *indemnitee* before settling demonstrates that the parties understood how to impose reasonable limits on a party's discretion not to consent to a settlement. *See* Defendants' Appendix at 31 (Asset Purchase Agreement, Paragraph 12(c)) ("The Indemnitor will not compromise or settle any such action, suit, proceedings, claim or demand without the prior written consent of the Indemnitee; provided, however, that in the event such consent is withheld, then the liabilities of the Indemnitor shall be limited to the total sum representing the amount of the proposed compromise or settlement and the amount of counsel fees accumulated at the time such consent is withheld."). The lack of similar protections for the indemnitor, under the circumstances, must be construed as reflecting the intent of the parties. *See* Defendants' Appendix at 33 (Asset Purchase Agreement, Paragraph 20) ("The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party."). It would be absurd and unreasonable to ignore the differences between the two clauses concerning one party's failure to obtain consent from the other to settlement of a third party's claims.

However, even if the court's construction of the indemnity agreement permits the Mefferd Defendants "to do nothing" and "to refuse to consent to any settlement," that result is not absurd and unreasonable—even if it is harsh or an unforeseen result of the contractual language—because the Mefferd Defendants do not "get out of jail free," as Kaydon characterized it during oral arguments. Instead, as demonstrated above, interpretation of the indemnity agreement as a whole permits the Mefferd Defendants to escape liability only for the *settlement,* not for Kaydon's *attorneys' fees and costs,* where the Mefferd Defendants have not consented to Kaydon's settlement. Thus, the penalty for Kaydon's decision to settle without the Mefferd Defendants' written consent was not a "free ride" for the Mefferd Defendants. Certainly, the choice between settling without written consent and going to trial was an unpleasant one; but that unpleasantness is far from "unreasonable," when Kaydon claims that it escaped possible liability for a judgment in the millions of dollars on the Irgens plaintiffs' claims,

forfeited indemnity for only $350,000 that it paid in settlement, and may still recover indemnity for its attorneys' fees and costs, which Kaydon asserts totaled over $200,000, and this result reflects the intent of the parties as reflected in the language they chose for the contract.

Thus, the court's interpretation of the language used in the indemnity provisions, as a whole and in context, does not lead to an unreasonable or absurd result.

### III. CONCLUSION

Upon the foregoing, although the parties' cross-motions for summary judgment resolve various issues, the motions do not resolve Kaydon's indemnity claim in its entirety. More specifically, the Mefferd Defendants are entitled to summary judgment in their favor that Kaydon's failure to obtain their written consent to Kaydon's settlement with the Irgens plaintiffs bars Kaydon from recovering the amount of that settlement from the Mefferd Defendants, *unless* Kaydon establishes at trial that the Mefferd Defendants had already repudiated the indemnity agreement by stating that they could not perform— which is an issue on which the court finds genuine issues of material fact. However, even assuming that the Mefferd Defendants did not repudiate the agreement, the Mefferd Defendants' motion for summary judgment on Kaydon's indemnity claim must be denied as to Kaydon's claim for attorneys' fees and costs in the Irgens litigation, because Kaydon's failure to obtain written consent to settlement does not, as a matter of law, bar that portion of Kaydon's indemnity claim.

By the same token, Kaydon is entitled to summary judgment in its favor that its failure to obtain written consent to settlement does not bar that portion of its indemnity claim seeking to recover its attorneys' fees and costs in the Irgens litigation. However, Kaydon is not enti-tled to summary judgment in its favor on its indemnity claim as a whole. Rather, the court finds that the Mefferd Defendants did not, as a matter of law, anticipatorily breach the indemnity agreement by refusing to defend Kaydon, refusing to pay Kaydon's on-going attorneys' fees and costs, or by asserting that there was no indemnity, because Kaydon was the "wrong party" to the Irgens litigation. Kaydon is also not entitled to summary judgment in its favor on its indemnity claim, because there are genuine issues of material fact as to whether the Mefferd Defendants made statements that they could not perform that were sufficient to constitute repudiation of the indemnity agreement. Finally, if there is no other bar to its indemnity claim, to recover indemnity, Kaydon must still establish at trial the existence of its liability to the injured party as an element of recovery for indemnification.

THEREFORE,

1. The Mefferd Defendants' December 8, 2003, motion for summary judgment (docket no. 13) is **granted in part and denied in part,** as explained more fully herein.

2. Kaydon's January 4, 2004, cross-motion for summary judgment (docket no. 14) is also **granted in part and denied in part,** as explained more fully herein.

**IT IS SO ORDERED.**